**EXHIBIT B**

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF ROCKLAND

Index R.I    JD-NOI

AUG 23 2016

Motion Cross SOS-S/Disc
Fee Pd $ SOS.

-----------------------------------------------------------------x

In the Matter of the Application of

MICHAEL SULLIVAN,

                              Petitioner/Plaintiff,

ORDER TO SHOW CAUSE

For a Judgment Pursuant to CPLR Article 78
and for a Declaratory Judgment and other relief

                              Justice Assigned:
                              Hon.

        - against -

GEORGE **HOEHMANN**, Individually and as Town
Supervisor of the Town of Clarkstown, Councilman FRANK
**BORELLI**, Individually and as a Member of the Clarkstown
Town Board, Councilwoman STEPHANIE HAUSNER, as a
Member of the Clarkstown Town Board, Councilman JOHN
J. **NOTO**, Individually and as a Member of the Clarkstown
Town Board, Councilwoman ADRIENNE D. **CAREY**,
Individually and as a Member of the Clarkstown Town
Board, The **TOWN OF CLARKSTOWN** and the **TOWN
BOARD** OF THE TOWN OF CLARKSTOWN,

Doc ID:        Type: COU
Kind: ARTICLE 78
Recorded: 08/23/2016 at 01:58:00 PM
Fee Amt: $210.00 Page 1 of O
Rockland County, NY
Paul Piperato County Clerk

SU-2016-001260

                              Respondents/Defendants.

                              Index No.:

-----------------------------------------------------------------x

PRESENT:        Hon.

        Upon reading and filing the annexed verified petition and complaint of Michael Sullivan,

dated August        , 2016 the affirmation of Richard A. Glickel dated August        , 2016, and the

exhibits annexed hereto,

        Let the respondents or their attorneys show cause before this court at the Rockland County

Courthouse, 1 South Main Street, New City, New York, on August        , 2016, at 9:30 a.m., or

as soon thereafter as counsel can be heard, why a preliminary injunction should not be granted herein

pursuant to CPLR § 7805 and CPLR Article 63, staying and enjoining the respondents, their agents,

servants and employees, and all persons acting on their behalf, pending the hearing or trial and determination of this proceeding and action, from taking any steps in furtherance of, or from commencing any disciplinary proceedings against the petitioner/plaintiff, the basis for which are any of the purported acts of misconduct and/or incompetence, etc., specified in the "notice and statement of charges" dated July 20, 2016, or any amendment or supplements thereto; and

It appearing that: (1) an action for a declaratory judgment to determine the respective rights, duties and obligations of the petitioner/plaintiff and the respondents/defendants concerning the government and control of the Clarkstown Police Department including, inter alia, the investigation, examination and discipline of the members of the Clarkstown Police Department exists under CPLR 3001, and that (2) the verified petition raises questions that address respondents' actions as being in excess of and/or without jurisdiction and respondents failure to act in accordance with law pursuant to CPLR § 7801, et seq., including, inter alia, respondents' violations of Public Officers Law § 100, et seq., (viz., the Open Meetings Law) and the Rockland County Police Act, and that (3) the verified petition/complaint states one or more causes of action for a permanent injunction against respondents' retaliatory and improper government action and for ancillary relief; and

It appearing further that the "notice and statement of charges" dated July 20, 2016, establishes respondents/defendants intention to schedule and proceed with the hearing of disciplinary charges and that such hearing would render ineffectual any declaratory judgment and/or judgment in accordance with CPLR § 7806 in favor of the petitioner/plaintiff and that immediate irreparable injury, loss or damages will result unless the respondents/defendants are stayed and restrained from proceeding with such hearing; and

It appearing further that the "notice and statement of charges" establishes petitioner's

2

suspension from duty as Clarkstown's Chief of Police pending the disposition of the charges and specifications contained in the "notice of statement of charges", and that by virtue of his suspension petitioner/plaintiff has already been caused to suffer, and will continue to suffer, irreparable injury, loss or damages unless the respondents/defendants are stayed and restrained and unless the petitioner/plaintiff is immediately reinstated to duty as the Town of Clarkstown's Chief of Police before a hearing or trial can be had and a determination rendered by the Supreme Court in this hybrid action; it is

ORDERED, that pending the hearing or trial and determination of this hybrid action, the respondents/defendants herein be, and they hereby are, STAYED and RESTRAINED from taking any steps or action with reference to the continued prosecution of the charges set forth in the "notice and statement and charges" dated July 20, 2016, or any amendment or supplements thereto; and it is further

ORDERED, that pending the hearing and determination of this hybrid action, the respondents/defendants herein be and they hereby are STAYED and RESTRAINED from suspending or otherwise prohibiting the petitioner from the continued and uninterrupted performance and exercise of his duties as Chief of Police for the Town of Clarkstown; and it is further

ORDERED, that *forthwith* the respondents/defendants are to return to the petitioner all police identification, weapon(s), vehicle(s), computers, phones, keys and all other paraphernalia surrendered by petitioner upon his suspension; and it is further

ORDERED, that *forthwith* the respondent/defendant GEORGE HOEHMANN is to communicate to each and every employee of the Town of Clarkstown Notice that Michael Sullivan has been fully restored to his position as Chief of Police of the Clarkstown Police Department. Said

3

Notice is to be distributed by email or facsimile and "hard" copies of the Notice are to be posted conspicuously in each Town department, including the office of the town supervisor, and on the bulletin board directly across from the town clerk's counter in the main lobby of the Clarkstown Town Hall, as follows:

## NOTICE

**Please be advised that effective immediately and pursuant to a temporary Order of the Supreme Court of the State of New York, County of Rockland, Chief Michael Sullivan has been fully restored to his position as Chief of Police of the Clarkstown Police Department and he shall exercise all of the powers and duties vested in him as a law enforcement officer and the chief executive officer of the Department pursuant to federal, state or local law, rule and regulation.**

**Dated: August _____, 2016.**

s/ George Hoehmann
George Hoehmann, Supervisor

and, it is further

ORDERED, that service of copies of this Order and the papers upon which it is granted and the verified petition and exhibits thereto, upon the respondents either personally or by overnight delivery, ON OR BEFORE August _____, 2016, shall be deemed good and sufficient service.

Dated: New City, New York
August _____, 2016.

_____
Hon.

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF ROCKLAND
------------------------------------------------------------------------X
In the Matter of the Application of

MICHAEL SULLIVAN,

                Petitioner/Plaintiff,

For a Judgment Pursuant to CPLR Article 78
and for a Declaratory Judgment and other relief

      - against -

GEORGE HOEHMANN, Individually and as Town
Supervisor of the Town of Clarkstown, Councilman FRANK
BORELLI, Individually and as a Member of the Clarkstown
Town Board, Councilwoman STEPHANIE HAUSNER, as a
Member of the Clarkstown Town Board, Councilman JOHN
J. NOTO, Individually and as a Member of the Clarkstown
Town Board, Councilwoman ADRIENNE D. CAREY,
Individually and as a Member of the Clarkstown Town
Board, the **TOWN OF CLARKSTOWN** and the **TOWN
BOARD** OF THE TOWN OF CLARKSTOWN,

               Respondents/Defendants.

------------------------------------------------------------------------X

**AFFIDAVIT**

Justice Assigned:
Hon.

Index No.:

State of New York   )
                   )ss.:
County of Rockland )

      Michael Sullivan, being duly sworn, deposes and states:

      1.   I am the chief of police of the Town of Clarkstown and the petitioner/plaintiff in this

hybrid action. I respectfully submit this affidavit in support of my application for an emergency stay

and preliminary injunction restraining and enjoining the respondents from proceeding with the

prosecution of charges created by the respondents and for my immediate reinstatement to duty

pending the hearing, trial and determination of the issues raised and claims alleged in my verified

petition & complaint.

**Some background.**

2.     My career in law enforcement began in 1983 as a member of the NYPD, where I served until 1987, and received several awards and citations as a patrolman. In 1987, I transferred my service to the Clarkstown Police Department ("CPD"), where my father – who retired from CPD in the mid-nineties after 30 years of service – still worked at the time.

3.     Working midnights, I attended the School of Criminal Justice at John Jay College and earned my bachelor's degree in police science. In addition to my work assignments, I became a member of the Department's ceremonial honor guard.

4.     As a new sergeant in 1995, I was assigned to the Critical Incident Response Team (CIRT), a specialized unit for response to hostage crises, barricaded subjects, high risk search warrants and dignitary protection and I served as an instructor at the Rockland County Police Academy, instructing police recruits on New York's penal law.

5.     I was promoted to patrol Lieutenant in 2001 and assumed responsibility for a squad. With the "operational" side of policing, I was also gaining experience at some of the administrative aspects of police work – like training, purchasing, budgeting, etc. That same year I was selected, and attended, the FBI's National Academy in Quantico, Virginia.

6.     In 2004, I was appointed to head the CIRT tactical team. During this time I also served as chairperson of the CPD Awards Committee, the Records Management Committee (researching, selecting and implementing the department's record, dispatch and report writing computer system); as well as working on the department's Public Answering Point Team (that committee designed CPD's new 911 phone, radio and communications center).

7.     Attaining the rank of Captain in 2009, I was assigned administrative duties including

oversight of all training and the "business" side of policing (budget and purchasing), and personnel review and other issues concerning the Department's rank and file.

8. In February 2011, I was appointed Chief of Police (permanent) of the Clarkstown Police Department by a unanimous vote of the Town Board.

9. As Chief of Police, I've promoted a community policing philosophy, developed a mission statement and a code of ethics for the department. I have strived to demonstrate, through my own work, the positive traits of a dedicated law enforcement professional.

10. I continue to explore innovative ways to restructure the Department and to cut costs in ways that make sense, but never to the dilution of public safety. By the restructuring of personnel work assignments, efficiency increased while the expenditures to run the department decreased. Controlled spending reduced the CPD operating budget from a high of $2,100,000 in 2011 (when I began as chief) to $1.6 million this year.[1] I have initiated and overseen the Intelligence Led Policing Program, the community outreach initiative, heroine and narcotics prevention programs and the introduction of CPD to Facebook and other social media programs.

11. When the town board called upon all department heads for a 15% reduction of employee overtime (which was later reduced to a 7.5% reduction), the police department responded to the town board's call by reducing CPD overtime by 20%!

12. Budget and overtime reductions resulted in a smaller, less expensive police department that is more proactive and responsive to the community.

13. I have served in law enforcement for 33 years rising through the ranks of the Clarkstown

---

[1] The operating budget represents the non-salary portion of the Department's annual budget.

Police Department to become the town's police chief. I have appreciated nearly every moment of my career but, without a doubt, the last 8 months have proven the most difficult in my experience.

14. No amount of on-the-job training or decades of law enforcement experience would prepare me for the malicious, retaliatory personnel action waged against me.

15. It was apparent from our initial post-election meeting in November 2015, that the supervisor-elect was most interested in procuring my exit as police chief. Since then, Hoehmann has been working towards that goal. His efforts aren't subtle and his primary motivator is apparent to even a casual observer.

### Hoehmann's campaign and biggest contributor.

16. The administration of disability benefits claims for members' injuries suffered in the performance of police duty, including the grant or denial of the benefit and determinations for the continuation or termination of such benefits, are vested in the chief of police.

17. Michael Garvey was a CPD sergeant who claimed an injury in January 2008. After remaining absent from work for over two years – during which time he received his full salary and benefits – Garvey was ordered to return to a light duty assignment, which he followed until January 2012 when he refused to continue that assignment though he remained able to do so. Rather than work, Garvey spent his leave accruals to remain on payroll. A hearing officer ruled against Garvey's claim for continued benefits finding that his gouty arthritis wasn't caused by the claimed work-related injury.

18. At the end of 2012, the town board acted unanimously to terminate Garvey's salary benefits. Garvey sued and lost. He appealed, and lost.

4

19. When the legal appeals had ended, the town board voted to finally separate Garvey from service. By leaving work and having spent his accruals, Garvey could not reach a 20-year service retirement. Had he kept working back in 2012, Garvey would have earned his 20-year service retirement by January 2014.

20. Through entrepreneurial successes Garvey is a millionaire; and he's never stopped lobbying town officials in an effort to try to reach a 20-year NYS service retirement pension he now covets.

21. On the evening the town board voted to separate Garvey from his town employment last August, then "candidate" Hoehmann – for the first time – publically questioned the board's actions before the assembled audience.

22. Within a few weeks of that August 2015 town board meeting, it was reported that Hoehmann and the Republican Party's Chair were seen lunching in Congers and Hoehmann was heard loudly demanding money from the party for his campaign.

23. On October 9, 2015, the Journal-News reported a "mysterious" donation in the sum of $216,000 had been made to the Reform Party of New York from the "Institute for Municipal Safety Research LLC", a Delaware limited liability company with a reported address in the same building and on the same floor as the offices of the Rockland County Republican Party Chair. The $216,000 was the sole donation made to the Reform Party. The Institute for Municipal Safety has no web presence, no phone number, and no information regarding the principal(s) or its legal representative is readily available.

24. On October 26, 2015, the Journal-News reported that $107,000 of the $216,000 had passed through Robert Astorino's Reform Party to Hoehmann's campaign with the balance going

5

to the Rockland Republican Party. In that story, the Westchester County Executive confirmed that the donor was "a guy in Rockland."

25. Research has since linked the LLC and the donation to Michael Garvey.

**The chief's list.**

26. Less than two weeks after his election as town supervisor, I welcomed the opportunity for an informal meeting with Hoehmann at CPD headquarters.

27. In my office, Hoehmann wondered why the department did not have a current chief's list, i.e., a viable list of "eligibles" for the position of chief of police.

28. This was no innocent inquiry. Still, I politely explained the customary process, that when the current chief decides to retire a new chief's test is scheduled with sufficient time for the candidates to study, take the exam and have the results in time for the town board to interview the top three candidates and decide on the new appointee before the scheduled departure of the retiring chief.

29. I reminded Hoehmann that I was only 53 and at the present time was not even considering retirement.

30. Hoehmann was uninterested in my explanation and asked that I call for a chief's exam, in the interests supposed interests of "continuity" and "succession." As an aside, Hoehmann mentioned that he would be seeking proposals for an efficiency study of the department.

31. Within days of our meeting people were asking if I was leaving the department? I was told to view Hoehmann's "Facebook" page, where the supervisor-elect had posted his pretended "surprise" at learning there was no current chief's list and that he had directed me to call for a civil

service exam in the interest of "succession planning" and "continuity." There was no mention by Hoehmann of the reason why there would not be a list when the current chief wasn't retiring.

32. As the "chat" continued on Facebook, someone posted in reference to the "mystery donor" of the $216,000 contribution to the 2015 campaign and, almost instantly, all of the posts and comments regarding the chief's test were taken down from the supervisor's Facebook page.

33. The nexus between that contribution to the supervisor's campaign and Hoehmann's interest in "succession planning" was clear. It had nothing to do with "continuity" and everything to do with Hoehmann's aim to replace me as chief of police.

**Don't call us, we'll call you.**

34. With the New Year and "transition" under the new town board, I anticipated my opportunities to interact with the supervisor and town board.

35. I had asked that I be allotted some time at January's first scheduled workshop meeting to talk with the board about hiring new officers as we were operating with four open spots and a new police academy class would start in February 2016. Although we were, at the time, within minimum staffing requirements, that could quickly change as the status of a police force is always in a state of flux. I was also concerned over rumors that the next police academy class (in August '16) could be cancelled due to the county's fiscal woes.

36. I felt discussion about the requested officers was important and I was also looking forward to meeting with the new town board and to start working with the new board.

37. After the public portion of the meeting, I was told that the board was too busy to talk with me that evening. I told the supervisor that I would call the town board members tomorrow and

he agreed that would be a good idea.

38. The next day, Hoehmann called to tell me not to call the town board members. According to Hoehmann, he and Councilmen Noto and Borelli had decided not to consider new hires until an "efficiency study" was performed. It seemed that the board had decided a policing issue without even hearing my concerns or knowing what I needed to discuss with the board.

39. Hoehmann now sought to limit my access to the town board as a body. I was "ordered" by the supervisor to have no communication with the town board via email or by telephone to the individual board members. Hoehmann's message was clear, when and if we need to talk to you Chief Sullivan, we'll call. Exhibit K.

40. As chief of police, I had never been told not to communicate with the members of the town board. The government and control of the police department – my duties as chief of police – were being usurped by an individual(s) with no law enforcement experience or knowledge of the day-to-day business of the Clarkstown Police Department.

**The "efficiency study".**

41. For most towns and villages with police departments, the single largest expense of the municipal budget is the police department. CPD is certainly no exception. Of course, the budget "line" for CPD also represents the greatest number of employees out of all the town's departments. And since Clarkstown has been consistently recognized as one of America's safest places to live, the town's investment in police and equipment, etc., produces a real public safety dividend annually.[2]

---

[2]    Which makes Clarkstown a desirable place to live and work. From a quality of life perspective public safety has an indispensable role. The presence of a well-trained, community oriented local police department provides a sense of security for family, promotes participation and social interaction and commerce within the town and serves to enhance property values.

42. Having pledged to lessen the taxpayers' burden by reducing the size and cost of local government, the supervisor announced an intended efficiency study of the police department.

43. We anticipated receiving the completed efficiency study by the end of June, so that we could hire more officers, as needed, in time for the August police academy.

44. I suggested that it would be a good idea to have the police administration and the PBA involved in the process, including assisting in the preparation of the required request for proposals ("RFP"), which could make the study "more efficient." Hoehmann agreed that all parties working together on the efficiency study was a great idea.

45. It seemed to me that the chief executive officer of the police department would be an essential participant in the preparation of the RFP for the efficiency study and that I needed to participate in the vetting of the responding firms. I was not.

46. Instead, near the end of January, I was given a finished copy of the RFP and told that it was being made public that day. The document was handed to me with the warning that I might be called by a reporter for a comment, and if I did speak with the press I was to call and report to Hoehmann what was said.

47. When I returned to my office there was a message from a Journal-News reporter stating that he had a copy of the RFP and asking for my comment. The supervisor's office had given the RFP for an efficiency study of the town's police department to the media before sharing it with the police chief.

48. While I wasn't included in the preparation of the RFP, nor had I the opportunity to study the document, I remained steadfast in the department's cooperation with the anticipated efficiency study.

9

49. But, my involvement wasn't solicited or welcomed. Despite my requests for information on the entities that had responded to the RFP, I never was provided with that information.

50. On February 25, 2016, I contacted the supervisor's "chief of staff", Vincent Balascio, and requested the names of the companies that had responded to the town's request for proposals. Balascio stated that he would have to ask Hoehmann if I was allowed to have that information.

51. Two days later, I asked the supervisor for the names of the companies answering the RFP and was told by Hoehmann that he would have to run my request by the town board because it was "their" project.

52. Since I wasn't allowed access to the town board except through Hoehmann and Hoehmann could not give me an answer because this was, according to Hoehmann, "the town board's project", the impossibility of my dilemma was apparent. I was being deliberately misdirected on who to ask for information about the study of the police department after Hoehmann had promised that CPD would be included in the selection process.

53. It was not until the vetting process was completed and the firm was chosen that Hoehmann advised me the Bonadio Group ("Bonadio") would be doing the efficiency study and that Westchester County Police Commissioner Longworth and one of his lieutenants (Lt. Weiss) would be assisting Bonadio in the study.[3] As it turned out, Bonadio was a strong public accounting and auditing firm with no experience in the evaluation of police departments.

54. The next day my captains and myself attended a conference to meet Tim Ball of the Bonadio Group and Lt. Weiss. That meeting confirmed that Bonadio had never done a study of this

---

[3] I'm uncertain what was the perceived necessity, or the intended roll Bonadio's Westchester "police liaisons" were to play in the study, or whether their retainer was part of, or in addition to, the $98,000 fee of the original proposal.

nature, which was why they included Longworth and Weiss.

55. Hoehmann left the meeting stating firmly that "the town board has thoroughly vetted this company and have made our decision. You are just here to meet them, that's all!"

56. The town board had indeed made their decision and I was deliberately not included in the vetting process – a fact that Hoehmann would disavow to the media in the days to follow – and had contracted with a very fine auditing company that had zero experience in performing an efficiency study for a large police department.

57. As the chief of police of New York's largest town police department, I had to state my concerns.

58. As quoted by the Journal-News, my comments were unchanged from what I expressed after Bonadio had been selected without the department's participation in the vetting process:

> "I have reservations. The company is highly qualified but they have never done an efficiency study like they are asked to do now, and I am concerned about Clarkstown being the first one. I am not saying that they are not a good company. I am just saying they don't have the experience. We are going to do everything in our power to make it a success. We're going to do our duty".

Exhibit L.

59. In short, I told the reporter that we would cooperate with the study. My statements were professional and honest.

60. Proclaiming his "mandate" to reduce town costs, Hoehmann described my remarks as "inconsistent" – they weren't. He claimed I was dishonest when I revealed that I'd been excluded from the vetting process – I wasn't. According to Hoehmann the only reason I would have for questioning the wisdom of hiring Bonadio was because I must have something to hide – I didn't and

11

don't. Exhibit M.

61. I gave my word that the department would cooperate in the study and I have kept my word by honoring CPD's commitment to facilitate the efficiency study.

62. When the Bonadio Group asked for information and statistics that CPD (and other police departments) did not maintain in the ordinary course of business, I took it upon myself to assemble that information for them. This required the creation of specific algorithms and a dedicated computer program to gather the requested information and collate it in a usable format. There was no delay in getting Bonadio Group any of the information they needed.

63. CPD's Sgt. Steven Cole-Hatchard was instrumental in getting the data needed to complete Bonadio's study. I was gratified that the collaboration with Sgt. Cole-Hatchard had been successful.

64. Bonadio's report was supposed to be completed by the end of June to allow for the new hires I had requested in January. With time growing short for the August police academy and the efficiency study report not rendered as of July 18, I reminded the town board of my request for permission to hire the officers. While I had agreed in January to delay the hiring of recruits until the mid-year efficiency study, it was my duty to keep the town board advised of the changes in police personnel as well as my opinion of the necessity for avoiding a shortage of police officers.

65. Because the Bonadio efficiency study was not ready and because our staffing issues had become more pressing, I wrote to the town board on July 18, 2016, detailing the change in status of CPD staffing that required me to write and request permission to immediately hire some new police officers.

66. I carefully explained what had changed since January and went on to describe those

12

changes and wrote, "[the] problem is compounded by the fact that we have no idea how many officers are planning on retiring early 2017." Exhibit N.

67.  I explained all of the other factors leading up to my request so that the Board would have a full picture of the facts and circumstances surrounding the need for me sending my email.

68.  This too was assailed by the supervisor. Instead of hearing the thoughts of the town board, I received an email from Hoehmann that same evening that never mentioned the Board's input or opinions addressing my concerns. Hoehmann ended his message writing that "[t]he inconsistency in your statements are confusing and troubling".

69.  The time has passed to acquire recruits for the August academy.

**Police department e-mails.**

70.  In mid-January the supervisor directed that only the town's network security administrator and his data processing department would have access and total control over all electronic information systems, including the police department's confidential records and information systems.

71.  Granting the town's IT department total control over the police department's emails, "chats", etc., presented an immediate problem. CPD would have no idea who was accessing our information, what was being shared or how it was being used. The town now would have unlimited, unchecked access to police information without the department's knowledge of who was accessing police records.

72.  Police undercover operations, confidential and sensitive investigations are now at risk. Confidential information can be compromised and rendered unusable for criminal prosecutions. The

ability of non-police or unauthorized personnel having access to the department's data and information violates interagency agreements and security rules governing the exchange of criminal and investigative information by and between law enforcement departments and agencies.

**First evidence of a leak.**

73. Following a CPD arrest on February 22, 2016, a detective asked to send out a press release because there was a chance that there were more victims, possibly minors.

74. The next morning I received a call from the supervisor's "chief of staff" (or "finance director"), Vincent Balascio, who told me he (Balascio) heard that CPD had made an arrest and were planning a press release. I knew for a fact this information had not been disseminated outside the department and there could be no way Balascio would have this information if there were not some sort of leak.

75. I confirmed that this was, in fact, what we were doing, and Balascio immediately said, "Well, don't. And, as a matter of fact, all of your press releases now have to be cleared through me."

76. In the supervisor's office I asked Balascio what his interest was in this particular investigation and press release and how he found out about it in the first place, Balascio stated that it was "none of my business".

77. It certainly was my business. I now believed that information on a very sensitive subject was leaked or otherwise obtained by non-police personnel in the town supervisor's office concerning an investigation dealing with a delicate subject and I needed to locate the source.

78. By now the supervisor's office had unfettered and undetectable access to the department's emails, chats, documents, etc., without CPD's knowledge.

79. At that point in time, the only other possible source of their knowledge about the arrest and CPD investigation was their contact with someone having information on the matter and Hoehmann and Balascio were withholding that information from CPD.

80. This information breach proved my concerns that, identifies, information, confidential sources, strategies, etc. on the CPD server had been compromised because George Hoehmann and others were so concerned about being tied to Garvey's $216,000 donation, they were reduced to "spying" or searching CPD's server to glean information about what we were working on.

81. With unauthorized, non-police personnel accessing our system, searching our emails, monitoring our calls, chats, etc., all investigations, past and present, could be jeopardized and we have already been told that other local departments and the District Attorney's office are now forbidden to share information with CPD unless it is done in person, which seriously hampers the department's efficiency in obtaining and processing information.

82. Hoehmann's sole purpose for these actions was self-preservation and was undertaken without regard for law enforcement, the public's safety or the adverse impact upon the day-to-day operations of the police department.

**My computer is hacked.**

83. On April 26, 2016, I was preparing to attend a 3-day training conference. Before leaving the office that evening I powered down my computer.

84. When I returned to work on May 2, 2016, I could not sign onto anything in the network and called my IT officer, Sgt. Gorsky, to check my computer.

85. Gorsky noticed an error message which indicated that another computer was using my

internet protocol address ("IP"). Someone had cloned my machine and had access to all my information, emails, chats, etc.

86. Tests confirmed someone external to the department was using my IP address and now we were faced with the possibility that my computer had been hacked.

87. I called the supervisor's office to describe our discovery and asked if there were any testing (e.g., "penetration" testing) being performed on the system? Hoehmann answered immediately that no penetration testing was being conducted and suggested that it should be okay if we "turn everything back on".

88. Considering that just three weeks prior the supervisor had expressed his serious concerns over cyber security, his suggestion seemed nonchalant.

89. Immediately following my telephone conversation with Hoehmann the connection between my computer and the "cloned" or hacking computer stopped.

90. The investigation into what was happening to my computer continued and another active computer was found that had been set up with my IP address and computer name (worrisome because the name is inputted manually so this could not be a coincidence).

91. Testing showed that my computer was being used while I was away from the office on April 27, 28 & 29, and was still showing activity on May 2 when I returned and that the activity originated at an account used by the town's IT Department at 10 Maple Avenue.

92. It was ultimately learned that the unknown device that hacked my computer was a windows computer using the same address. However since so much of technology is virtual, it is nearly impossible to know where this originated.

93. What we do know is that the "virtual" clone was listed on the network under the "10

16

Maple" icon and it appeared that someone was trying to use a naming convention for the virtual clone that would not raise suspicion.

94. The information from CPD's investigation was reviewed by the Department of Homeland Security, the NYPD Organized Crime Cyber Security Unit and the Rockland County Bureau of Criminal Identification ("BCI"). All agreed my computer had been hacked. Only Hoehmann and the town's IT administrator disagreed.

95. Since the supervisor's involvement and adverse employment actions arising from the improper and unnecessary use of CPD's server has come to light, Hoehmann has created a story of investing in the Google Vault software[4] and checking the police department's emails was to comply with FBI subpoenas that had been served on the prior administration.

96. Hoehmann's explanation has been categorically refuted by the Rockland County District Attorney who has stated that the subpoenas referenced by the supervisor were served and complied with earlier in the corruption task force investigation and, in any event, none of the subpoenas served by the district attorney's office required any search or information from the Clarkstown Police Department!

**Sgt. Cole-Hatchard.**

97. On June 28, 2016, I was asked to attend a town board executive session. I had hoped to use this opportunity to present and discuss the "Raids On Line" program I wanted to implement at CPD.

98. Instead I was informed by the deputy town attorney that the town board had "uncovered"

---

[4]    The same software the supervisor had claimed was necessary for "data retention".

a very serious breach of security involving a high ranking member of the department.

99. I was told that Sgt. Stephen Cole-Hatchard, ("Sgt. Cole-Hatchard" or "Cole-Hatchard"), who helped start and was then directing the Joint Strategic Intelligence Unit ("SIU"), had divulged confidential information to a reporter about a personnel disciplinary matter concerning another officer (who was also suing the town over earlier disciplinary matters), and that the information had been divulged prior to formal charges being served on the officer.

100. When I asked to be provided with evidence of the leak, the Board refused to inform me as to how they came to have this knowledge, who the reporter was that Sgt. Cole-Hatchard had spoken with, when they spoke or what they discussed. All they would tell me was that they had the information in their possession for "several days."

101. The manner in which the Board was making their complaint was irregular at best. Anyone making a police complaint would be required to share with the police any information they had regarding their complaint. Even in the best light, the town board was, in fact, obstructing a police investigation.

102. The fact that they had the information for "several days" could have also caused a problem. Time is a factor because pursuant to the Rockland County Police Act and the Department's rules, the time to prefer charges is limited. I'm no lawyer, but know enough to be concerned that defense counsel could argue successfully that the limitations period should be calculated from the date the Board had learned of the misconduct.

103. The town board wanted the captains to begin an immediate investigation and called for Cole-Hatchard's immediate removal from the SIU. Protocol required that, as his immediate supervisor, I would undertake the investigation.

104. I voiced my opinion that removing Sgt. Cole-Hatchard from his current assignment could prove damaging to public safety and might be deemed a punitive or adverse employment action since we had not started, much less completed our investigation.

105. I was then directed to immediately conduct an interview with Cole-Hatchard and to make sure my questions were" vague". The way in which this matter was shared with me, along with the directives I was given as to questioning the sergeant were most unusual. Standard procedure in these matters would be to immediately turn the entire matter over to CPD and allow me to conduct an independent investigation. I assured the Board this matter would have my attention.

106. I commenced the investigation process on June 29, 2016 and informed Sgt. Cole-Hatchard that I was conducting an internal investigation into the allegation made against him and requested an immediate formal interview after he had time to consult with his PBA representative and attorney.

107. Supervisor Hoehmann and Town Attorney Sciarretta were briefed on my progress and advised that Cole-Hatchard was leaving for vacation that evening (June 29) and would not be returning to New York until the evening of July 3rd. They asked that I interview Sgt. Cole-Hatchard before he left for vacation.

108. In my interview on June 29, Cole-Hatchard seemed to remember receiving an email from a Journal-News reporter around the time of the incident that would eventually result in disciplinary charges against the other officer and responded that he (Cole-Hatchard) did not want to discuss the matter. Sgt. Cole-Hatchard stated that he did not remember speaking with the reporter about the matter and that he would not have known anything to discuss in any event as the underlying incident was unknown to him. My findings were shared with the deputy town attorney

that evening.

109.    On Friday afternoon, July 1st, after I had left my office for the weekend, I received a memo from Hoehmann stating that I was to immediately reassign Cole-Hatchard out of the SIU to CPD Headquarters and to assign him duties that would have no access to the media. This directive was to be carried out "irrespective of the outcome of your investigation", a decision that was reached after separate consultation with other members of the Town Board serving as the "Board of Police Commissioners". The memo demanded confirmation of this action being taken that very day, despite although Hoehmann knew Sgt. Cole-Hatchard was out of state through July 3rd. See Exhibit D.

110.    The Board was pressing for the removal of Sgt. Cole-Hatchard from the SIU without consideration for the repercussions of his abrupt removal; he was the key person in the SIU at a time when intelligence is crucial to police departments.

111.    At this point, I did not know how or when the town board came to possess its "evidence" of the alleged misconduct, or even what the "evidence" was. Hoehmann's memo described the agreement of the "other board members." Exhibit D.

112.    Absent a vote or other record of the board's adverse personnel action, I contacted the "other board members" to confirm their agreement to Cole-Hatchard's reassignment. By contacting the town board I was, in fact, following my direct chain of command protocol.

113.    I went to CPD Headquarters on the Fourth of July to advise Cole-Hatchard of his reassignment. Cole-Hatchard had called in sick so I remained at HQ until I could reach him by telephone to convey the reassignment order. I advised the town board and went home to resume my own vacation.

114.    I did talk with the "Journal-News reporter" who told me that Cole-Hatchard did not

20

answer his (the reporter's) question about the other officer and he had not discussed the pending disciplinary matter with Sgt. Cole-Hatchard after the email.

115. Upon my return from vacation on July 11, I asked CPD Sgt. Gorsky to retrieve Sgt. Cole-Hatchard's emails for the period March 28, 2016 through June 28, 2016, the date I was made aware of the Board's allegations.

116. Gorsky advised that since January, he could not access that information and we would have to go through the Bob Paul, the town's IT administrator as he (Paul) was the only one with the clearance to access that information.

117. I received and reviewed the requested emails.[5] There was one email mentioning the other officer's name. That was sent to Cole-Hatchard on the day the underlying incident that would result in disciplinary charges and there was no information in response as Cole-Hatchard had no information concerning the underlying incident.

118. Had the town board on June 28, shared their "information" with me, it could have saved everyone a great deal of time and worry.

119. The email exchange between the reporter and Cole-Hatchard that I reviewed discussed the Michael Garvey/George Hoehmann connection to the $216,000 campaign donation, the pending federal litigation and the possibility of the town's rumored settlement with Garvey.

120. The possible disclosure of confidential information was simply a pretext for removing Cole-Hatchard from the SIU. The primary topic of the discussion between the sergeant and the reporter was the $216,000 campaign contribution. Nothing in the Cole-Hatchard email thread was

---

[5]    Since January 2016, non-police personnel at town hall had -- and still have -- access to sensitive and confidential law enforcement information to which my Department lacks access or the ability to track or to know who is accessing police information.

21

privileged or confidential or a violation of the General Orders of the police department.

121. For the sake of thoroughness, I had also requested that I be provided copies of Sgt. Cole-Hatchard's emails dating back to January 1, 2016. Nothing further was found in those emails, but it was my intention to interview Cole-Hatchard further on the subject of Garvey.

122. On July 19, 2016 I received another email from the supervisor, this time accusing me of allowing the Cole-Hatchard investigation to lag and opining that I should have had "more than enough time to complete the investigation." Hoehmann demanded my immediate reply with an update. Exhibit O.

123. I replied to Hoehmann at 12:05 p.m., that the investigation was not lagging, that additional information made it necessary for me to have another interview with Cole-Hatchard; however at that point there did not seem to be any evidence of misconduct. At 12:07 p.m., I wrote to my captains to advise them that the supervisor wanted the investigation completed as soon as possible and asked them to arrange to meet with me that same afternoon. Exhibit O.

124. Hoehmann's reply was that he wanted to see me in his office prior to that evening's town board meeting. Exhibit P.

**Irreconcilable differences?**

125. I arrived at supervisor's office at 7:30 p.m.,expecting to have a conference with Hoehmann regarding the status of the Cole-Hatchard investigation. I instead walked into an ambush.

126. Lying in wait for me was the entire town board, (with Councilwoman Hausner on speaker phone), the town attorney and deputy town attorney and Hoehmann's chief of staff.

127. According to the deputy town attorney, who was the spokesman, the town board had

discussed the matter and felt there were "irreconcilable differences" with myself, and they (the Board) wanted to go in a "different direction."

128. I had worked with three of the five current town board members for over 7 years and never had a cross word or serious difference of opinion with any of them. The two newest town board members did not know me at all and given Hoehmann's directive that I have no contact with them, there really was no way for them to know me.

129. To say I was taken "by surprise" is an understatement. The attorney did not explain or list what he meant by "differences" and since I had never been approached by anyone ever stating that my work or my attitude was unsatisfactory and inasmuch as my service record was unblemished, there could be no justifiable basis for the Board's action.

130. The deputy attorney went on to state that, despite these "differences", the town board was offering a "generous settlement" to honor my years of service.

131. The Board's "generosity" would allow me to remain as Chief; I could not come to work, or visit police headquarters, and I was not to discuss the matter ever or sue the town. I would then remain on the payroll through December 31, 2016 and retire as Chief. They also demanded my irrevocable letter of resignation. See Exhibit F.

132. Alternatively, there were the charges and specifications of my purported misconduct that had been prepared. If I declined the "settlement" I would be suspended immediately with pay pending a disciplinary hearing.

133. I was then advised that the Town's generosity would end at 3 p.m. the following afternoon. The deputy town attorney hoped I would take the settlement so I could leave CPD with "my dignity intact." I was further advised that if I told anyone about this meeting, the "deal was off."

In short, the town board was promising to ruin my career and reputation if I did not accede to their demand and quietly retire.

134.    After considering the offer and my options, I decided that to succumb to Hoehmann's extortionist tactics offended my own sense of ethical behavior and opposed everything that I had worked so hard to achieve during my life.

135.    I declined the town's offer.

136.    On July 20, I reported to the supervisor's office and was immediately suspended with pay, made to surrender my badge, gun and police I.D. My access to CPD was revoked and my vehicle was relocated somewhere away from the headquarters parking lot.

137.    Instantly a global email and press release[6] was broadcast from the supervisor's office announcing my suspension.

138.    Before the Board's action, in Rockland County no chief of police had ever been suspended from duty. Not one.

### Reinstatement pending the court's determination.

139.    I've dedicated my life to a career in law enforcement. I have worked and studied and trained to become the best law enforcement professional I could possibly be. I make this request for a stay and my immediate reinstatement as Clarkstown's chief of police pending the court's determination of the issues raised in my verified petition not only to restore my own reputation, but for the reputation of my family who have been subject to unnecessary questions and pressures since

---

[6]    According to the town's press release, "following a unanimous decision by the Town Board, Chief Michael Sullivan has been suspended." Exhibit G. There was no vote, there are no minutes or any record of the Board's closeted meeting.

the announcement of my suspension from duty. My father served as a Clarkstown police officer for 30 years. My wife and children work in the community. I need to reinstated also to save the Clarkstown Police Department from the town's current administration who are attempting to seize command and control of the Clarkstown Police Department through usurpation of the powers and duties invested in the duly appointed chief of police.

140. The respondents have knowingly committed egregious acts to cover their own wrongdoing. The charges and allegations of purported misconduct demonstrate unequivocally that the respondents abused their access to information taken from the police department's computers with intent to advance their retaliatory actions.

WHEREFORE, I respectfully request an order granting a temporary stay and pursuant to CPLR § 7805 and/or CPLR Article 63:

A. Staying and enjoining respondents from taking any steps or action(s) with reference to the continued prosecution of the charges stated in the "notice and statement of charges" dated July 20, 2016, or any amendment or supplement thereto, pending Supreme Court's hearing and determination of petitioner's hybrid CPLR Article 78/Declaratory Judgment action; and

B. Staying and enjoining respondents from suspending or otherwise prohibiting the petitioner from the continued uninterrupted performance and exercise of his duties as Chief of Police for the Town of Clarkstown pending Supreme Court's hearing and determination of petitioner's hybrid CPLR Article 78/Declaratory Judgment action; and

C. Directing that respondents return forthwith to the petitioner all of his police identification, weapon(s), vehicle, computers, etc., and all other paraphernalia surrendered by the

25

petitioner on or about July 20, 2016; and

D.     Directing that respondent George Hoehmann communicate, distribute and post conspicuously an announcement to every department head and to each and every employee of the Town of Clarkstown that Michael Sullivan has been fully restored to his position as Chief of the Clarkstown Police Department; and for such other and further relief as the Court deems just, proper and equitable.

_____
Michael Sullivan

Sworn to before me this
19th day of August, 2016.

RICHARD A. GLICKEL
Notary Public, State of New York
No. 02GL4608027
Qualified in Rockland County
Commission Expires _____, 20____

26

# Attorney's Affirmation

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF ROCKLAND
-------------------------------------------------------------------x
In the Matter of the Application of

MICHAEL SULLIVAN,

                                    Petitioner/Plaintiff,

For a Judgment Pursuant to CPLR Article 78
and for a Declaratory Judgment and other relief

        - against -

GEORGE HOEHMANN, Individually and as Town
Supervisor of the Town of Clarkstown, Councilman FRANK
BORELLI, Individually and as a Member of the Clarkstown
Town Board, Councilwoman STEPHANIE HAUSNER, as a
Member of the Clarkstown Town Board, Councilman JOHN
J. NOTO, Individually and as a Member of the Clarkstown
Town Board, Councilwoman ADRIENNE D. CAREY,
Individually and as a Member of the Clarkstown Town
Board, the TOWN OF CLARKSTOWN and the TOWN
BOARD OF THE TOWN OF CLARKSTOWN,

                                    Respondents/Defendants.
-------------------------------------------------------------------x

ATTORNEY'S STATEMENT

Justice Assigned:
Hon.

Index No.:

        Richard A. Glickel, an attorney duly admitted to practice in the Courts of this State, does

hereby affirm pursuant to CPLR 2106 and under penalty of perjury, that the following is true:

INTRODUCTION

        1.  I am the attorney for Michael Sullivan ("petitioner") and I am fully familiar with the

facts and recent history of the interactions and events leading up to the present proceeding and I

respectfully make this attorney's statement in support of petitioner's application for a stay and

temporary and preliminary injunctive relief pending the hearing and determination of this hybrid

action which seeks, inter alia, declaratory and permanent injunctive relief.

2. An immediate stay, or an order granting temporary and preliminary injunctive relief is necessary *now* to restrain respondents from continuing with proceedings that are undermined by illegitimate government action taken without jurisdiction and in avoidance of the Open Meetings Law and which evidence a vindictive and clearly retaliatory purpose.

3. Absent the requested emergency stay and preliminary injunction, respondents will continue to act in violation of petitioner's rights that are the subject of this hybrid action. The relief demanded in the petition, if granted, would entitle petitioner to a judgment restraining the respondents from the continued prosecution of dishonest disciplinary charges which, if continued during the pendency of this action will cause petitioner to suffer further injury and render Supreme Court's judgment ineffectual.

NATURE OF THE CASE

4. As stated in the annexed petition, the purpose of this hybrid action is to enjoin the continued prosecution of disciplinary charges and petitioner's suspension from duty, which result from respondents' illegal actions that were in violation of, *inter alia,* the Open Meetings Law,[1] the Rockland County Police Act[2] and the Rules and Regulations & General Orders of the Clarkstown Police Department (*see* Verified Petition ¶¶ 11-21).

5. When the respondents underlying conduct is itself illegal, the resulting actions are void ab initio and unenforceable. Stated a little differently, the fruits of illegality – in this case the creation

---

[1] Public Officers Law § 100, et seq.

[2] L.1936, c. 526.

of charges and petitioner's suspension – are poisoned and cannot be permitted to advance before the court has heard and rendered its judgment and declaration on the issues raised.

6. The hybrid petition/complaint shows, *inter alia*, that,

- respondents failed to perform a duty enjoined upon them by law when, acting as public officers and as a public body on July 1, 2016, respondents intentionally avoided the applicable requirements of the Open Meetings Law when they determined to remove and reassign a member of the Clarkstown police department ("CPD") under petitioner's command (Verified Petition ¶¶ 63-70);

- respondents failed to perform a duty enjoined upon them by law when acting as public officers and a public body on July 19, 2016, respondents voted to – and did – charge and suspend petitioner from duty (Verified Petition ¶¶ 71-74);

- insofar as the respondents purported to act or have acted as a non-existent "board of police commissioners", all such actions are without jurisdiction (Verified Petition, ¶¶ 75-78);

- that in directing the reassignment of a member of the CPD prior to the completion of petitioner's investigation of the member's alleged improper conduct, respondents acted in excess of jurisdiction (Verified Petition, ¶¶ 79-83);

- that in directing the reassignment of a member of the CPD prior to the completion of petitioner's investigation of the member's alleged improper conduct, respondents acted in violation of lawful procedure (Verified Petition ¶¶ 84-88);

- that respondents' determination to remove and reassign a of a member of the CPD before the completion of petitioner's investigation of the member's alleged improper conduct, was arbitrary and capricious and an abuse of discretion (Verified Petition ¶¶ 89-93);

- that respondents creation and preferring of disciplinary charges against the petitioner and petitioner's suspension from duty constitute (a) retaliatory personnel action against petitioner in violation of Civil Service Law § 75 (b) and Labor Law § 740 (Verified Petition ¶¶ 94-133; and

3

    ●   that respondents creation and preferring of disciplinary charges against the petitioner and petitioner's suspension from duty was in retaliation for the exercise of petitioner's First Amendment rights (*see* Verified Petition ¶¶ 134-147).

7.   Given respondents illegitimate actions, a stay -- right now -- and petitioner's reinstatement to duty are crucial to protecting against petitioner's unnecessarily suffering further harm prior to a judicial review and declaration of the illegality of respondents' actions and Supreme Court's nullification of those actions.

## THE FACTS

8.   The facts relevant to the underlying hybrid action are presented in the petition (Verified Petition ¶¶ 22-62), and in petitioner's affidavit in support of this application for a stay and temporary injunctive relief.

### A. "CPD".

9.   Petitioner is Clarkstown's police chief. His unanimous appointment to the position of (permanent) police chief is recorded in the minutes of the March 15, 2011 meeting of the Clarkstown town board.[3]

10.   In 1937 the Town of Clarkstown had a four-man police department.[4] Today, the Clarkstown Police Department (or "CPD") is New York's largest town police department comprising 164 police officers and additional support staff of 24 civilian employees including police

---

[3]     Town board resolution no. 98-2011.

[4]     As originally established in 1937 under the Rockland County Police Act ("RCPA"), Clarkstown's police department had a police chief, two full-time police officers and one part-time officer.

dispatchers and clerical personnel.

11. Petitioner is the chief executive officer of the police department, subject to the prescribed rules and regulations of the department. Under the Department's rules and regulations petitioner is invested with the government and control of the Clarkstown police department and its members.[5]

12. The police department's current "chain of command" flows from the town board to the chief of police and from the chief to the members of the department under his command. Accordingly, the chief reports directly to the town board only.[6]

B. **The Rockland County Police Act.**[7]

13. The Rockland County Police Act "is a special statute providing for the establishment, organization and operation of police departments" in the County's towns (*see Stony Point Policemen's Benev Ass'n, Inc. v Shankey*, 125 AD2d 314, 315 [2d Dept.1986]).

14. Under the RCPA, the town board may establish a board of police commissioners consisting of either, three police commissioners, or one police commissioner and two members of the town board to serve on the police commission (see *Stony Point PBA v Shankey*, 125 AD2d 315).

15. From 1974 through 2004, the Town of Clarkstown did, in fact, have a police commission

---

[5]     Rules & Regulations of the Clarkstown Police Department, General Order 110, II (A) (1). Exhibit C.

[6]     Compare the year 2000 CPD organizational chart – the last chart preceding the police commission's dissolution – with the most current version of the department's organizational chart (11/11/2015). The charts are annexed as one Exhibit I .

[7]     A copy of the Rockland County Police Act, as amended, is annexed as Exhibit B.

consisting of one police commissioner and two town board members.[8] The town board's minutes reflect that starting with the first appointments in 1974 and continuing every second year thereafter through and including 2002, the town board did appoint a police commissioner and two town board members to serve on the police commission.

16. In April 2004, the town board resolved to abolish the Clarkstown Police Commission. Since then, the town board has never re-established a police commission.

17. At present, Clarkstown does not have a "board of police commissioners".

18. As a "special law" the RCPA supercedes the Town Law concerning the establishment and organization of police departments in Rockland County. Thus, a town board cannot designate the town supervisor to serve as the town's police commissioner as permitted by section 150 of the Town Law (*Id.*). Nor does the RCPA designate the town board as the "board of police commissioners". Under the RCPA there are only two options for establishing a "board of police commissioners".[9] [10]

---

[8] The first police commissioner appointed in 1974 was retired chief Ernest Wiebicke – the same man who started as the Department's part-time police officer in 1937. Clarkstown's last police commissioner, John "Jack" Danahy, was a retired FBI agent.

[9] Unlike the Westchester County Police Act (L.1936, c.812), which specifies that "[t]he town board of a town in which such police department has been established shall be the board of police commissioners", no such language or provision exists within the RCPA. In Clarkstown (and the County's other towns) a police commission can be established only by one of the two options provided by the statute, *viz.,* (1) three police commissioners or, (2) one police commissioner and two members of the town board to serve on the police commission (*see Stony Point Policemen's Benev Ass'n, Inc. v Shankey,* 125 AD2d 314, 315 [2d Dept.1986]).

[10] Which is not to imply that the town board is powerless with respect to the police department. The town board can exercise all of the powers conferred upon town boards by the Rockland County Police Act, including *inter alia,* appointing a chief of police and such other police officers as may be necessary, maintaining service records per the state civil service commission, adopting written rules and regulations for the government and administration of the police

19. The actions of a non-existent public body or commission are without legal authority or effect and all such actions purportedly taken by the respondents acting as, or on behalf of, the "board of police commissioners" are void *ab initio*.[11]

20. All orders or "directives" issued on behalf of the non-existent public body are without legal force or effect; and all of the charges of "misconduct" related to respondents' legally ineffective actions are equally invalid.

### C. The chief.

21. Petitioner began his 33-year career in law enforcement as a member of the New York City Police Department. In 1987 petitioner joined CPD as a patrolman. Over the next quarter-century petitioner ascended the department's ranks – maintaining an unblemished service record – as sergeant (1995), lieutenant (2001) and administrative captain (2009), culminating in his appointment as Chief of Police in the Spring of 2011.

22. By most accounts, petitioner's demonstrated leadership and interpersonal skills are praiseworthy. He is held in high regard by his peers and respected by the men and women under his command. Petitioner was raised in Clarkstown and likes serving his community. As recent events have unfolded, it's apparent that the community likes him too.

23. Until last Fall's election, petitioner had enjoyed an excellent working relationship with

---

department, including rules for police discipline, charges and hearings, and consenting to the police chief's detective appointee(s). RCPA §§ 2, 4, 6, 7 & 13.

[11]    Putting aside respondents' obvious violation of the Open Meetings Law, Hoehmann's "order" which petitioner is alleged to have disobeyed, and which serves as the basis for "charges I, II, III & IV, purports to be issued by "or on behalf of" the non-existent board of police commissioners. See, Exhibits A and D.

the town board. The supervisor's door was open for conference and discussion of police department programs, personnel issues, operational costs and budget meetings.

24. Following the 2015 vote the winds of change in the town supervisor's office shifted from mutual cooperation to an atmosphere of contention and open disrespect towards the police administration.

25. There were *pre* and post-election reports in the media of large contributions to the supervisor's campaign originating from a former Clarkstown police officer whose failed legal claims for reinstatement resulted in that officer's separation from service in 2015.[12]

26. Prior to his candidacy, Councilman Hoehmann unfailingly joined in the town board's unanimous support for the town's defense of the ex-officer's claims. Instantly, *candidate* "Hoehmann-for-Supervisor" reversed his position, and began suggesting that the town reach a settlement with (as was later uncovered) his biggest backer.

27. Concerned that he was witness to the influence of external interests that were infecting the new supervisor's actions, petitioner met with the District Attorney and reported his (petitioner's) belief that Hoehmann and others had engaged, and were engaging in, improper governmental action that was in violation of the "Public Trust Act" (Penal Law § 200.00, et seq.). Verified Petition ¶¶ 190-113.

28. Since then, Hoehmann has disparaged and purposely seeks to discredit petitioner through public comment and in memoranda and e- messages copied to the members of the town board and others.

---

[12]     See *Matter of Garvey v Sullivan*, 129 AD3d 1078 (2d Dept.2015); *lv denied*, 26 NY3d 916 (2016). A copy of the Decision, Order & Judgment as entered by the clerk of the Appellate Division on June 24, 2015, is annexed as Exhibit J.

29. Two weeks after the November 2015 election, Hoehmann asked that petitioner call the County's commissioner of personnel to request that Clarkstown be included in the next scheduled civil service exam for the position of chief of police. Hoehmann's request was questionable – to say the least – because the town had a relatively young, healthy and experienced police chief, who entertained no thoughts of early retirement.

30. At age 53, petitioner has no present intention of retiring. As a permanent civil service appointee petitioner could continue as chief until attaining mandatory retirement age.

31. However, if the supervisor and his allies on the town board can – somehow – convict petitioner on charges of disciplinary misconduct, they would then force his departure. This is George Hoehmann's shameless goal to achieve either, petitioner's retirement or dismissal.

32. On July 19, 2016, petitioner was presented with written charges of alleged misconduct and incompetence and petitioner was suspended from duty with pay, effective 7/20/16, pending a disposition of those charges.

33. As demonstrated in the verified petition, respondents actions leading up to and including petitioner's suspension were in violation of lawful procedure, rendered without jurisdiction and in retaliation against petitioner for (1) his objecting to, and (2) his disclosure of respondents' improper government action, and (3) petitioner's exercise of protected free speech.

D. **Reinstatement during the stay.**

34. Petitioner' suspension is at once, unprecedented and irresponsible.

35. Until petitioner's suspension by these respondents, no town board had ever suspended a Rockland County police chief – *not ever!*

36. The unprecedented suspension of the veteran chief of the town's police department at a time when public anxiety and real concern for police safety have reached a previously unheard national crescendo, proves respondents' indifference for the police department and the protection of Clarkstown's citizens.

37. For no other reason – and even if the court declines to grant the requested stay pending its determination of petitioner's hybrid action – in the interest of public safety, petitioner should be immediately reinstated and permitted to resume his duties as Clarkstown's chief of police.

## The Legal Standard

38. Pending the outcome of an Article 78 proceeding, the court "on motion of any party or on its own initiative" may stay further proceedings or enforcement of a determination pending its review pursuant to CPLR 7805 (*see Albany Basketball & Sports Corp. v City of Albany*, 39 Misc3d 1204 (A) [Sup.Ct., Albany Co.2013]; see generally Alexander, Practice Commentaries, McKinney's CPLR § 7805).

39. In deciding whether to grant a requested stay pursuant to CPLR 7805 some courts have applied the same standard applicable to a motion for a preliminary injunction, *i.e.,* movant must show three things, "a probability of success on the merits, danger of irreparable injury in the absence of an injunction and a balance of the equities in movant's favor" (*id., citing Melvin v Union College,* 195 AD2d 447, 448 [2d Dept.1993]).

### A.  Likelihood of success.

40. To establish a likelihood of success on the merits petitioner must show that his right to a preliminary injunction is plain on the facts of the case (*Melvin,* 195 AD2d 448).

10

41. "[T]he existence of a factual dispute will not bar the imposition of a preliminary injunction if [the stay] is necessary to preserve the status quo and the party to be enjoined will suffer no great hardship as a result of its issuance" (*Id.*).

42. The requirement that petitioner demonstrate a likelihood of success on the merits "does not compel a demonstration that success on the merits is practically a certitude" (*see Emerald Green Property Owners Ass'n Inc. v Jada Developers, LLC,* 63 AD3d 1396, 1397 [3d Dept.2009]; *citing Egan v New York Care Plus Inc. Co.,* 266 AD2d 600, 601 [3d Dept.1999]). Stated a little differently, the showing of a likelihood of success required for a preliminary injunction "must not be equated with a showing of certainty of success" (*see Bingham v Struve,* 184 AD2d 85- 88-89 [1st Dept.1992]). "It is enough that the moving party makes a prima facie showing of his right to the relief; the actual proving of the case should be left to the full hearing on the merits" (*Albany Basketball & Sports Corp.,* 39 Misc3d 1204).

43. The petition and the documents submitted in support of this application for a stay do demonstrate petitioner's likelihood of success on the merits. Respondents actions in violation of law and in excess of jurisdiction, their improper governmental action and retaliatory motives in the creation of charges against the petitioner and petitioner's unprecedented suspension, establish petitioner's right to temporary injunctive relief.

B. **Irreparable injury.**

44. By suspending petitioner, respondents did immediately strip[13] petitioner of his duties and

---

[13]     Petitioner surrendered his police identification, his weapons, his vehicle and related police paraphernalia and is denied access to the department where he's served honorably for nearly 30 years.

powers as the chief executive officer of the Clarkstown Police Department.

45. The fact that petitioner's suspension is with pay doesn't cover-up respondents improper and retaliatory scheme for effecting the retirement or dismissal of Clarkstown's chief of police by the creation of frivolous disciplinary charges.

46. Petitioner's suspension was intended to – and has caused, inter alia – embarrassment, personal and public humiliation and mental anguish for petitioner and his family.

47. Respondents recent appointment[14] of special counsel and a hearing officer prove respondents' intent to proceed with a disciplinary hearing that will cost petitioner several thousands of dollars for a legal defense against frivolous allegations of misconduct.

48. Petitioner has already been irreparably harmed and will continue to suffer harm absent a stay. Petitioner's irreparable harm is not a loss of salary or money already spent, or the projected expense of additional legal fees, rather it is the damage to his reputation as a respected chief executive officer of New York's largest town police department and the negation of his important role, and positive image, as the public "face" of the Clarkstown Police Department.

**C. A balance of the equities favors petitioner.**

49. Touching on the "equities" of this application, the scales tip decidedly in favor of a stay.

50. Respondents should not be allowed to mar petitioner's professional reputation and a heretofore unblemished record during 33-years of law enforcement service by the unprecedented suspension from duty of a Rockland County police chief.

51. Neither the respondents, the police department, the town or its citizens, will suffer any

---

[14]    By town board resolution(s) adopted on August 9, 2016.

harm by petitioner's reinstatement and staying the respondents from proceeding with the prosecution of the charges and other adverse employment action against the petitioner during the pendency of the court's hearing and determination of the underlying hybrid action.

52. While no harm can result from the requested stay, petitioner's reinstatement would have the positive consequence of restoring the Chief's stewardship and steadying hand to the Clarkstown police department and ease public safety concerns.

53. Respondents could not have chosen a more inopportune moment to suspend the town's police chief. Police morale and public safety would be well-served by petitioner's immediate reinstatement.

## NOTICE OF THIS APPLICATION

54. There's been no prior application to this, or any other court, for the relief sought herein.

55. Advance notice of the submission of this application for a stay and temporary injunctive relief was provided to the Clarkstown town attorney in a manner sufficient to permit respondents the opportunity to appear in response to the application.

56. An affirmation of good faith accompanies and is appended to the motion papers. (22 NYCRR § 202.7 [f]).

## CONCLUSION

57. Petitioner's application for a stay of the disciplinary charges and proceedings and petitioner's immediate reinstatement to duty pending Supreme Court's hearing and determination of petitioner's hybrid CPLR Article 78/Declaratory Judgment action should be granted.

WHEREFORE, petitioner respectfully requests an order pursuant to CPLR § 7805 and/or CPLR Article 63,

A.     Staying and enjoining respondents from taking any steps or action(s) with reference to the continued prosecution of the charges stated in the "notice and statement of charges" dated July 20, 2016, or any amendment or supplement thereto, pending Supreme Court's hearing and determination of petitioner's hybrid CPLR Article 78/Declaratory Judgment action; and

B.     Staying and enjoining respondents from suspending or otherwise prohibiting the petitioner from the continued uninterrupted performance and exercise of his duties as Chief of Police for the Town of Clarkstown pending Supreme Court's hearing and determination of petitioner's hybrid CPLR Article 78/Declaratory Judgment action; and

C.     Directing that respondents return forthwith to the petitioner all of his police identification, weapon(s), vehicle, computers, etc., and all other paraphernalia surrendered by the petitioner on or about July 20, 2016; and

D.     Directing that respondent George Hoehmann communicate, distribute and post conspicuously an announcement to every department head and to each and every employee of the Town of Clarkstown that Michael Sullivan has been fully restored to his position as Chief of the Clarkstown Police Department; and for such other and further relief as the Court deems just, proper and equitable.

Dated:  West Nyack, New York
        August 18, 2016

                                      Richard A. Glickel

14

Notice Affirmation

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF ROCKLAND

---------------------------------------------------------------------x

In the Matter of the Application of

MICHAEL SULLIVAN,

                                        Petitioner-Plaintiff,                  ATTORNEY'S AFFIRMATION
                                                                              (22 NYCRR § 202.7 [7])

For a Judgment Pursuant to CPLR Article 78
and for a Declaratory Judgment and other relief
                                                                              Justice Assigned:
          - against -                                                         Hon.

GEORGE HOEHMANN, Individually and as Town
Supervisor of the Town of Clarkstown, Councilman FRANK
BORELLI, Individually and as a Member of the Clarkstown
Town Board, Councilwoman STEPHANIE HAUSNER, as a
Member of the Clarkstown Town Board, Councilman JOHN
J. NOTO, Individually and as a Member of the Clarkstown
Town Board, Councilwoman ADRIENNE D. CAREY,
Individually and as a Member of the Clarkstown Town
Board, the TOWN OF CLARKSTOWN and the TOWN
BOARD OF THE TOWN OF CLARKSTOWN,
                                                                              Index No.: SU-2016-001260
                                        Respondents-Defendants.

---------------------------------------------------------------------x

          Richard A. Glickel, an attorney duly admitted to practice in the Courts of this State, does

hereby affirm pursuant to CPLR 2106 and under penalty of perjury, that the following is true:

          1.   I am the attorney for the petitioner-plaintiff in this hybrid CPLR Article 78/Declaratory

Judgment action.

          2.   Petitioner is proceeding by Order to Show Cause and seeks a stay pursuant to CPLR §

7805 and temporary and preliminary injunctive relief, and I make this "good faith notification"

affirmation in accordance with 22 NYCRR § 202.7 (f).

          3.   That on August 19, 2016, I spoke by telephone with William Harrington, Esq., who is

special counsel to the Town of Clarkstown and informed Mr. Harrington that I would be presenting petitioner's show cause order and supporting papers in furtherance of an application for temporary injunctive relief to the Supreme Court, Rockland County.

4. On August 23, 2016, I called Mr. Harrington to advise him of the filing of petitioner's application for temporary and preliminary injunctive relief and I sent the attached letter via facsimile to the office of the Bleakley Platt notifying Mr. Harrington that counsel would be heard on petitioner's application for temporary injunctive relief at the Rockland County Courthouse on August 26, 2016, at 10 a.m./p.m., before Hon. Gerald Loehr.

Dated:    West Nyack, New York
           August 23, 2016.

                                Richard A. Glickel

2

# RICHARD A. GLICKEL
### ATTORNEY AT LAW
CENTEROCK EAST • SUITE 103
TWO CROSFIELD AVENUE
WEST NYACK, NEW YORK 10994

(845) 353-4300
FAX (845) 353-6221
rglickel@optonline.net

MARY KAY RIVERA, RP
REGISTERED PARALEGAL
mkrivera@optonline.net

August 23, 2016

By Fax To: (914) 683-6956

William P. Harrington
Bleakley Platt & Schmidt, LLP
One North Lexington Avenue
White Plains, New York 10601

Re:    Matter of Sullivan v Hoehmann, et al.
        22 NYCRR § 202.7 (f)

Dear Mr. Harrington:

     This will confirm that the undersigned will be making an application for temporary injunctive relief pursuant to CPLR § 7805, etc., to be presented to Hon. Gerald Loehr, a Justice of the Supreme Court, Rockland County, at the Rockland County Courthouse, 1 S. Main Street, New City, New York on Friday, August 26, 2016 at 10 a.m.

     You are invited to appear at the stated date, time and place that the application will be made and to be heard in response to the application.

     Thank you.

Very truly yours,

Richard A. Glickel

RAG:me