59.     On information and belief, Officer T had recently sold a family business for at least $2 million.

60.     On information and belief, with the help of Westchester Attorney and Rockland Republican Committee Chairman Lawrence Garvey, Officer T created, and now controls, an entity known as the "Institute for Municipal Safety Research LLC."

61.     On information and belief, Officer T funded that entity with no less than $218,000.

62.     Around the same time of Officer T's termination, HOEHMANN, who was then an elected member of the TOWN BOARD OF CLARKSTOWN, announced his candidacy for Town Supervisor against the incumbent Supervisor in the November 2015 election as the Republican candidate.

63.     During that campaign, on information and belief, Officer T contributed $218,000 to the campaign accounts of Town Supervisor Candidate Hoehmann, the Rockland County Republican Party, and Westchester County Executive Rob Astorino, and thousands more to the campaigns of Councilmen Borelli and NOTO, and others.

64.     According to public campaign finance records, on October 9, 2015 the Institute contributed $109,000 to two campaign accounts controlled by Westchester County Executive Rob Astorino, known as the N.Y.S. Committee of the Reform Party, and $109,000 to the Rockland County Republican Party, controlled by attorney Lawrence Garvey.

65.     Approximately 10 days later Astorino's Reform Party transferred $96,053 directly to an account entitled "George Hoehmann."

66.     State finance laws limit individual contributions to a Town Supervisor's race to $2,700.

11

67.    According to public records, Officer T made many other contributions directly to the involved officials, including an additional $1,750 to the Rockland County Republican Party, and $2,000 to HOEHMANN's running mate NOTO.

68.    Numerous other tangentially related transactions are reported in these same campaign finance records.

69.    Since Officer T's donations to HOEHMANN, and HOEHMANN's election as Supervisor, HOEHMANN has engaged in clear and continuous patterns of harassing CHIEF SULLIVAN, and of interfering with police operations and public safety efforts, with the apparent intent to force CHIEF SULLIVAN out of office one way or another, including by taking actions against the Chief's law enforcement programs such as the SIU and against COLE-HATCHARD, and for the ultimate purpose of reinstating Officer T for the previously alleged purpose of providing Officer T a publicly funded pension and taxpayer funded medical benefits for life.

### HOEHMANN BEGINS SURVEILLANCE AND REVIEW OF EMAIL COMMUNICATIONS OF COLE-HATCHARD, CHIEF SULLIVAN, AND OTHER HIGH LEVEL POLICE OFFICIALS OF THE TOWN OF CLARKSTOWN

70.    On information and belief, after taking office HOEHMANN instructed a civilian technology employee of the TOWN OF CLARKSTOWN to surreptitiously intercept and download the emails of CHIEF SULLIVAN, COLE-HATCHARD, and other high ranking police officials, for the purpose of ascertaining what, if any, communications have taken place regarding his biggest contributor, Officer T.

71.    HOEHMANN's decision to intercept and review such emails has resulted in civilian employees, with no legitimate law enforcement justification for doing so, accessing and

12

reviewing confidential law enforcement intelligence products developed by the SIU and CHIEF SULLIVAN.

72.     Such actions clearly risk compromising criminal investigative efforts and regional and National security and counter-terrorism activities.

73.     HOEHMANN's decision to access emails is contrary to sound policy regarding the management of criminal intelligence information systems.

## HOEHMANN DISCOVERS EMAIL COMMUNICATIONS BETWEEN COLE-HATCHARD AND A LOCAL NEWS REPORTER, AND USES THEM AS A PRETEXT TO DISGUISE THE RETALIATORY DISCIPLINE FOR COLE-HATCHARD'S CONSTITUTIONALLY PROTECTED EXPRESSION

74.     On information and belief, among COLE-HATCHARD's many emails that HOEHMANN and other civilians under his direction reviewed was an email exchange between COLE-HATCHARD and STEVEN LIEBERMAN, a local newspaper reporter, covering a period of time from March 16, 2016, through March 28, 2016.

75.     In substance and in fact, COLE-HATCHARD's email exchange with STEVEN LIEBERMAN, the local news reporter related to public campaign finance records and social media postings and social media chatter that were completely unrelated to COLE-HATCHARD's law enforcement duties, unrelated to Police Department records, and, in fact, unrelated to the TOWN OF CLARKSTOWN Police Department.

76.     Because COLE-HATCHARD was a former elected office holder, with a currently active campaign account, LIEBERMAN sought, as he had done on prior occasions, COLE-HATCHARD's reaction to his interpretation of donations going to HOEHMANN and the Republican Party, as discovered in campaign finance records by the reporter.

77.     In that email exchange, LIEBERMAN described what he found in public campaign financing records relating to HOEHMANN, Westchester County Executive Astorino, TOWN OF CLARKSTOWN Town Board members NOTO and BORELLI, and others.

78.     COLE-HATCHARD was off the clock and at home when the email exchange occurred.

79.     Via email, COLE-HATCHARD expressed his opinion that LIEBERMAN's analysis appeared to be accurate as compared to those public filings and other publicly available information on social media and in social media chatter.

80.     COLE-HATCHARD did not disclose or discuss any confidential information or data related to the Town of Clarkstown Police Department.

81.     In one of the emails, LIEBERMAN asked COLE-HATCHARD about another police officer employed by the TOWN OF CLARKSTOWN, a matter completely unrelated to the campaign finance story on which he was working.

82.     COLE-HATCHARD declined to discuss that matter.

83.     Despite the fact that COLE-HATCHARD never discussed that personnel matter and specifically declined to do so, HOEHMANN and the TOWN BOARD OF CLARKSTOWN adopted that exchange as a pretext for their current and planned actions, actions in fact taken to retaliate against, and to punish COLE-HATCHARD, for providing his personal opinion to LIEBERMAN, a local news reporter, on an important matter of public interest, an opinion he provided in his private capacity.

84.     If allowed, HOEHMAN's actions will irreversibly continue to penalize, stigmatize, and embarrass COLE-HATCHARD in his profession, his community, and personally as well, and continue to chill COLE-HATCHARD in the exercise of his First Amendment rights.

14

## HOEHMANN AND THE TOWN BOARD OF CLARKSTOWN INSTITUTE A PRETEXTUAL INTERNAL INVESTIGATION OF COLE-HATCHARD

85.    On Wednesday morning, June 29, 2016, MICHAEL SULLIVAN, Chief of

Police for the TOWN OF CLARKSTOWN prepared a written Notice of Internal Investigation

at the direction of HOEHMANN and the TOWN BOARD FOR CLARKSTOWN.

86.    The Notice of Internal Investigation was as follows:

"Clarkstown Police Department
Notice of Internal Investigation

To: Sergeant Stephen Cole-Hatchard
Date: June 29, 2016
From: Chief Michael Sullivan
Subject: Filing of Complaint / Allegation

A complaint/allegation was filed against you involving an incident that is to have
occurred sometime between March 27, 2016 and May 18, 2016 concerning the
following:

Complaint / Allegation:

It is alleged that you spoke with a reporter and divulged confidential information
regarding a pending disciplinary matter involving [a Town Police Officer], that
was being investigated by this department without authorization or authority. Said
information was allegedly given to this reporter prior to disciplinary charges
being officially served on the officer.

Complainant: The Clarkstown Town Board, Supervisor George Hoehmann,
Councilman Frank Borelli, Councilwomen Stephanie Hausner, Councilman John
Noto, and Councilwomen Adrienne CAREY.

This incident has been documented as Professional Standards Case Number AI
2016-007. You will be contacted in the near future in reference to the status of
this investigation."

87.    That same morning, June 29, 2016, CHIEF SULLIVAN contacted COLE-

HATCHARD and instructed him to report to his office rather than to the remote location of the

RC-SIU as usual.

88.     Upon his arrival, CHIEF SULLIVAN served COLE-HATCHARD with that "Notice of Internal Investigation."

89.     As stated in the Notice of Internal Investigation, HOEHMANN and the TOWN BOARD instigated the Internal Investigation by accusing COLE-HATCHARD of communicating with a member of the local news media about a pending personnel matter involving another TOWN OF CLARKSTOWN police officer without authorization.

90.     In fact, HOEHMANN, BORELLI, NOTO, CAREY, HAUSNER, and the TOWN BOARD OF CLARKSTOWN instigated their complaint against COLE-HATCHARD for political reasons to prevent disclosure and further dissemination of information about the aforementioned campaign contributions by OFFICER T and otherwise to chill the speech of COLE-HATCHARD and others about said illegal campaign contributions.

91.     CHIEF SULLIVAN then ordered COLE-HATCHARD to report back to the Chief's office at 3:00 pm on June 29, 2016, with counsel and a PBA representative if desired, to be questioned.

92.     That same day, as ordered, COLE-HATCHARD reported back to CHIEF SULLIVAN, accompanied by a PBA representative and a PBA Attorney.

93.     CHIEF SULLIVAN provided "Garrity" warnings to COLE-HATCHARD (Garrity v. New Jersey, 385 U.S. 493 (1967)), and advised him that if he refused to answer questions, or was untruthful, he could be disciplined, up to and including termination of employment.

94.     Based on the complaint by HOEHMANN, BORELLI, NOTO, CAREY, HAUSNER, and the TOWN BOARD OF CLARKSTOWN, CHIEF SULLIVAN asked COLE-

16

HATCHARD if he had ever had any communication with the media regarding the Clarkstown Police Department.

95.   COLE-HATCHARD truthfully responded in the affirmative.

96.   CHIEF SULLIVAN also asked COLE-HATCHARD if he had ever disclosed any information to anyone, including the media, relating to a disciplinary matter involving a Town Police Officer.

97.   Again COLE-HATCHARD responded truthfully, stating that COLE-HATCHARD did not do so.

98.   COLE-HATCHARD further advised CHIEF SULLIVAN that he was not aware of any facts relating to any disciplinary matters involving the particular Town Police Officer.

99.   At no time, either when he initially reported to CHIEF SULLIVAN or when he returned for the internal investigation interview with CHIEF SULLIVAN was COLE-HATCHARD advised of or afforded any of the rights or protections set out in the Rockland County Police Act or the TOWN OF CLARKSTOWN Discipline Rules, including rights to compensation if wrongly suspended without pay; to time to prepare for a hearing; to have the proceedings preserved stenographically; to be present during the interrogation of witnesses; to have witnesses cross-examined by counsel; to have the hearing conducted openly so that the public could be aware of the process being applied to him; to compel the attendance of witnesses; to submit documentary and other evidence for the record; and, to seek review on certiorari in the state supreme court.

100.   On information and belief, LIEBERMAN advised CHIEF SULLIVAN that he did not recall any discussion of the matter involving an internal affairs investigation of a Town

17

Police Officer with COLE-HATCHARD; LIEBERMAN confirmed that fact during an interview with CHIEF SULLIVAN related to the complaint against COLE-HATCHARD.

101.    In fact, at the time of the email exchange between COLE-HATCHARD and the reporter, the TOWN OF CLARKSTOWN could not possess any internal affairs information or investigative records on the incident for COLE-HATCHARD to review or discuss, as such records did not yet exist.

102.    Any claim that disciplinary action inflicted on COLE-HATCHARD relates to COLE-HATCHARD's violation of departmental policies about an ongoing internal investigation is pretextual and, on information and belief, it is known to be pretextual to the Defendants.

103.    HOEHMANN, , BORELLI, NOTO, CAREY, HAUSNER and the TOWN BOARD OF CLARKSTOWN, in retaliatory efforts to chill and otherwise violate COLE-HATCHARD's First Amendment rights, falsely accused COLE-HATCHARD of disclosing information that was not yet in existence.

104.    Upon information and belief, upon learning that the Complaint against COLE-HATCHARD was without foundation and that no evidence of wrongdoing was developed as well as that COLE-HATCHARD had interacted with the media for many years, HOEHMANN responded by sending via email an order to CHIEF SULLIVAN further instructing him about COLE-HATCHARD, and commencing retaliatory actions.

## HOEHMANN AND THE TOWN BOARD OF CLARKSTOWN DECIDE TO PUNISH COLE-HATCHARD DESPITE THE ABSENCE OF FINDINGS BY CHIEF SULLIVAN OF ANY BASIS IN FACT FOR THEIR COMPLAINT AGAINST COLE-HATCHARD

105.    HOEHMANN's email to CHIEF SULLIVAN contained numerous false and misleading statements, yet was placed in COLE-HATCHARD's Department personnel file, from which COLE-HATCHARD obtained a copy. The email was dated Friday, July 1, 2016, stating:

18

"Thank you for meeting with the Town Board this week on short notice to discuss this important matter. It is our understanding that you conducted the interview with Sergeant Cole-Hatchard and that you are awaiting additional information before preparing a report on this matter.

You have confirmed that Sgt. Cole-Hatchard is currently assigned to a particularly sensitive position as the Director of the Rockland County Strategic Intelligence Unit with broad access to confidential information. While it would be inappropriate at this time for the Board to receive detailed information regarding the investigation based upon the possibility of disciplinary proceedings, it is our understanding that Sergeant Cole-Hatchard admitted that he sent the email in question to a reporter in response to an inquiry regarding Officer [    ] status. Your investigation may or may not result in formal disciplinary charges against the Sergeant depending on numerous factors to be determined. It is, however, clear that there was an email exchange and a suggestion that the Sergeant and the Reporter would have further dialogue over Officer [    ] status.

This is a grave concern given the sensitive nature of the Unit and undermines our confidence in the same.

After separate consultation with other members of the Town Board who, as you know, serve as the Board of Police Commissioners, it is our position that there is substantial risk to the Town and the Department in leaving Sergeant Cole-Hatchard in his current position. Irrespective of the outcome of your investigation and whether disciplinary action is taken as a result of that investigation, his immediate reassignment today out of the Intelligence Unit to other duties appropriate to his status and rank as a detective sergeant within 20 Maple Avenue is necessary and directed.

Further, given the Board of Police Commissioners concern over a potential breach that may have occurred, Sergeant Cole-Hatchard is not to have any duties that place him in contact with members of the press and media, either direct or indirect.

Please confirm today, in writing to the Town Board, that this has occurred.

If you have any questions regarding this please contact me."

106.    HOEHMANN sent copies of the email to TOWN BOARD members BORELLI,

HAUSNER, NOTO, and CAREY.

107.    As the HOEHMAN directive shows, despite the outcome of the internal affairs

investigation and despite CHIEF SULLIVAN's conclusions about the matter, HOEHMANN,

BORELLI, HAUSNER, NOTO, and CAREY, and the TOWN BOARD OF CLARKSTOWN ordered CHIEF SULLIVAN immediately to: 1) remove COLE-HATCHARD from his position as the Director of the SIU; 2) remove COLE-HATCHARD from all other assignments and positions within the Department related to public information and media relations; 3) order COLE-HATCHARD's return to Clarkstown Police Headquarters; and, 4) issue an order prohibiting COLE-HATCHARD from having any contact with the media in any form or fashion.

108.    On information and belief, at a "Meet the Supervisor" coffee, HOEHMANN repeated the false and scurrilous, defamatory accusation from his email that COLE-HATCHARD presented a substantial risk if allowed to continue to serve in his position as Director of the Strategic Intelligence Unit; on that occasion, he repeated the remark to an employee of the Rockland County District Attorney's Office.

109.    On July 4, 2016, COLE-HATCHARD reported to CHIEF SULLIVAN as he was instructed to do and was assigned to headquarters duty.

110.    Because COLE-HATCHARD has suddenly and unexplainably been removed from his position, on information and belief, against the wishes of CHIEF SULLIVAN, COLE-HATCHARD's reputation and career have been irreparably harmed regardless of any future Court rulings.

111.    On information and belief, the actions of CHIEF SULLIVAN that gave effect to the demands of HOEHMANN and the other Defendants to discipline were taken by CHIEF SULLIVAN under duress and against his certain conclusion that the complaint against COLE-HATCHARD was utterly without merit.

112.    The peremptory demand made by HOEHMANN and the other Defendants, that CHIEF SULLIVAN discipline COLE-HATCHARD despite the absence of any evidence of

20

wrong-doing by COLE-HATCHARD, evinces the Defendants' moral culpability, and that HOEHMANN and the other Defendants were actuated by evil and reprehensible motives.

113.    At the time that HOEHMANN and the other Defendants coerced CHIEF SULLIVAN to take disciplinary action against COLE-HATCHARD, the right of a public employee to exercise the constitutionally protected right to freedom of speech, while acting in their private capacity and in order to address matters of great public importance, was clearly established in the law.

114.    Despite the clearly established nature of the right jeopardized and injured by them, HOEHMANN and the other Defendants acted maliciously and with direct disregard for that clearly established constitutional right of COLE-HATCHARD.

115.    COLE-HATCHARD has labored diligently for decades to establish himself as a knowledgeable, trustworthy and reliable resource, labor that culminated in his selection as the Special Intelligence Sergeant for the Police Department and the Director of the SIU. The discipline imposed by CHIEF SULLIVAN, under the coercion of HOEHMANN and the other Defendants, has already irreparably damaged his reputation for knowledgeability, trustworthiness and reliability.

116.    Sudden unexplained removal from a post of great responsibility and sensitivity without explanation has already worked to undermine and destroy COLE-HATCHARD's careful and diligent efforts; worse, that sudden removal jeopardizes COLE-HATCHARD's ability to employ his carefully cultivated reputation for the benefit of the TOWN OF CLARKSTOWN POLICE DEPARTMENT, for the benefit of the Strategic Intelligence Unit, and for himself.

117.    Nor have HOEHMANN left the matter as unexplained; rather, HOEHMANN and the other Defendants have deliberately, falsely, and maliciously defamed COLE-

21

HATCHARD with their unsupportable and mendacious suggestions that COLE-HATCHARD puts the TOWN OF CLARKSTOWN at risk by continuing in the sensitive post to which he had been assigned.

118.    As with many other professions, the law enforcement community is small, tight-knit, and guards itself against those that do not have and maintain character traits of discretion, sensitivity, and responsibility; as a consequence of HOEHMANN's and the other Defendants' actions, COLE-HATCHARD's prospects for obtaining employment in law enforcement are substantially harmed, as are his prospects for marketing his expertise in other markets.

## HOEHMANN AND THE TOWN BOARD REJECTED A DRAFT STUDY ON POLICE EFFICIENCY IN ORDER TO INFLICT FURTHER IRREPARABLE INJURY ON COLE-HATCHARD

119.    In furtherance of the above described actions and conspiracy to punish COLE-HATCHARD for expressing his personal opinion regarding the allegedly illegal, improper and corrupt activities of HOEHMANN and THE TOWN BOARD OF CLARKSTOWN, on information and belief, HOEHMANN and TOWN BOARD OF CLARKSTOWN are and will be engaging the BONADIO GROUP for additional action against COLE-HATCHARD.

120.    In January, 2016, HOEHMANN announced he was hiring a firm to conduct an "efficiency study" of the Police Department at a cost of $100,000 to Clarkstown taxpayers. HOEHMANN and THE TOWN BOARD OF CLARKSTOWN hired THE BONADIO GROUP, a CPA firm based out of Pittsford, New York. On information and belief the Bonadio Group had no experience conducting such a study, and no law enforcement expertise in house.

121.    On information and belief, to provide the appearance of law enforcement expertise, HOEHMANN and the BONADIO GROUP hired two "consultants" to oversee the law enforcement end of the study, namely, Westchester County Police Commissioner and Sheriff

22

GEORGE LONGWORTH, who was appointed to his position in Westchester by County Executive ROBERT ASTORINO, and one of LONGWORTH's employees.

122. On information and belief, THE BONADIO GROUP prepared an initial draft study on the Clarkstown Police Department, a report that was not unfavorable to the Clarkstown Police Department, and that was, in fact, complimentary to COLE-HATCHARD and his Strategic Intelligence Unit, acknowledging the Unit as engaging in the kinds of activities representing "the future of police work".

123. HOEHMANN and BORELLI, on information and belief, reviewed and rejected the initial draft study, directing THE BONADIO GROUP to review the draft with LONGWORTH and others to assure it was modified to meet the goals of HOEHMANN and BORELLI.

124. On information and belief, that report is now being revised, with a number of specific directives, one being to recommend the elimination of at least one "Detective Sergeant" position, which would be COLE-HATCHARD's position as a result of HOEHMANN's July 1, 2016 email.

125. HOEHMANN, on information and belief, ordered CHIEF SULLIVAN to take action against COLE-HATCHARD solely as a result of COLE-HATCHARD's exercise of constitutional rights in his capacity as a private person and citizen, exhibited when he expressed agreement with an interpretation of certain campaign donations and other publicly available information offered by a local news reporter on a matter in the public domain, unrelated to COLE-HATCHARD's duties as a Clarkstown Police sergeant.

126. The disciplinary actions described herein have been imposed, and further disciplinary actions are being threatened despite the fact that HOEHMANN was aware that,

23

although the investigation of the Board's complaint was not completed, no evidence of wrongdoing had been found.

## FALLOUT AGAINST CHIEF SULLIVAN

127. As further fallout of HOEHMANN's and THE TOWN OF CLARKSTOWN's retaliation against COLE-HATCHARD, CHIEF SULLIVAN was administratively suspended from his position as Chief of Police on the afternoon of July 20, 2016.

128. HOEHMANN, BORELLI, NOTO, CAREY, HAUSNER and THE TOWN BOARD OF CLARKSTOWN placed CHIEF SULLIVAN on administrative leave or suspension on July 20, 2016, a personnel action that on information and belief was known to OFFICER T and reported to others by OFFICER T nearly a day before the suspension occurred.

129. The reasons for suspending CHIEF SULLIVAN on July 20, 2016, are pre-textual.

130. HOEHMANN, BORELLI, NOTO, CAREY, HAUSNER and the TOWN BOARD OF CLARKSTOWN, ostensibly acting as the POLICE COMMISSION OF THE TOWN OF CLARKSTOWN, suspended CHIEF SULLIVAN because he has openly objected to their efforts to reinstate OFFICER T to his police position, in essence, a quid pro quo that would deliver to OFFICER T a $3 million taxpayer funded retirement and medical benefit package in exchange for substantial political campaign donations for the 2015 Town election.

## HOEHMANN AND THE TOWN BOARD ARE PREPARING TO INFLICT ADDITIONAL INJURY UPON COLE-HATCHARD

131. On information and belief, HOEHMANN, BORELLI, NOTO, CAREY, HAUSNER and the TOWN BOARD OF CLARKSTOWN, ostensibly acting as the POLICE COMMISSION OF THE TOWN OF CLARKSTOWN, are currently and actively engaged in

24

their unconstitutional efforts to suspend COLE-HATCHARD, without pay, in retaliation for his exercise of constitutionally protected rights of freedom of speech and freedom of association.

132.    On or about July 20, 2016, after administratively suspending CHIEF SULLIVAN, HOEHMANN, BORELLI, NOTO, CAREY, HAUSNER and the TOWN BOARD OF CLARKSTOWN appointed Robert G. Mahon to serve in the role of Acting Chief of Police.

133.    After his appointment as Acting Chief of Police, ACTING CHIEF MAHON informed COLE-HATCHARD that he would re-interview him.

134.    COLE-HATCHARD's constitutional rights are about to fall prey to these efforts.

135.    If COLE-HATCHARD is again suddenly demoted further, or terminated, against the judgment of CHIEF SULLIVAN, COLE-HATCHARD's reputation will be further harmed, and in addition, he will suffer a substantial loss of income.

136.    The aggressive and sudden actions already taken by HOEHMANN together with the other Defendants reflect their concerted efforts to stop further investigation into, or dissemination of information about, campaign donations received from OFFICER T and any subsequent personnel actions taken favoring OFFICER T or punishing COLE-HATCHARD.

## FIRST CLAIM FOR RELIEF;
## VIOLATION OF COLE-HATCHARD'S
## RIGHT TO FREEDOM OF SPEECH

137.    COLE-HATCHARD repeats and realleges paragraphs 1-136 as if fully set forth herein.

138.    COLE-HATCHARD participated in an exchange of emails with STEVEN LIEBERMAN, a local news reporter, in his capacity as a private citizen, a former elected official, and a person currently maintaining an active campaign account.

25

139.    COLE-HATCHARD's email exchange with a STEVEN LIEBERMAN took place "off the clock."

140.    COLE-HATCHARD's email exchange with LIEBERMAN was not in the nature of an intra-office communication.

141.    COLE-HATCHARD's email exchange with LIEBERMAN, expressing his opinion about questions related to certain campaign finance records that are part of the public domain was not directed to a colleague, a superior, or a subordinate, nor undertaken as part of any of his duties with the TOWN OF CLARKSTOWN Police Department or as Director of the Strategic Intelligence Unit.

142.    COLE-HATCHARD's email exchanges with LIEBERMAN addressed campaign finance and local elections, matters of great public importance.

143.    Upon discovery by HOEHMANN and the other Defendants that COLE-HATCHARD, in his private capacity and off the clock, had exercised his constitutional right to freedom of speech to communicate with STEVEN LIEBERMAN, a local news reporter, about apparent irregularities in donations made to several 2015 campaigns, HOEHMANN and the other Defendants decided to target COLE-HATCHARD for his constitutionally protected exercise of free speech.

144.    The Defendants have acted under the color of law and deliberately used their positions as Town Board members to interfere with COLE-HATCHARD's right to freedom of speech by prohibiting him from having contact with members of the media. Defendants have willfully and maliciously retaliated against COLE-HATCHARD for his previous exercise of his right to freedom of speech.

26

145.    Defendants have displayed deliberate indifference to COLE-HATCHARD's
Constitutional rights, the deprivation of which was a foreseeable consequence of Defendants'
conduct.

146.    As a result of the aforesaid wrongful actions, policies and/or customs, the
Defendants injured COLE-HATCHARD by depriving him of his rights.

147.    COLE-HATCHARD has no adequate remedy at law for the harm and damage
caused by Defendants' violation of his constitutional rights.

148.    Defendants have caused said COLE-HATCHARD to suffer already, and to
continue to suffer, irreparable harm, damage, and injury.

149.    Unless the Defendants are enjoined from their conduct, COLE-HATCHARD
will continue to suffer the deprivation of his constitutional rights to freedom of speech.

150.    COLE-HATCHARD respectfully requests that the Court grant him relief from
the injuries complained of herein, as more particularly stated in the Prayer for Relief.

## SECOND CLAIM FOR RELIEF:
## VIOLATION OF COLE-HATCHARD'S
## CONSTITUTIONAL RIGHTS TO DUE PROCESS

151.    COLE-HATCHARD repeats and realleges paragraphs 1-150 as if fully set forth
herein.

152.    COLE-HATCHARD has a liberty and property interest in his employment with
the TOWN OF CLARKSTOWN Police Department, and in his position as Director of the RC-
SIU.

153.    As to COLE-HATCHARD, Defendants have acted under color of law but in an
arbitrary, outrageous, and irrational manner, interfered with his liberty and property interests.

27

154.    Defendants have displayed deliberate indifference to COLE-HATCHARD's

constitutional rights, the deprivation of which was a foreseeable consequence of Defendants'

conduct.

155.    As a result of the aforesaid wrongful actions, policies and/or customs, the

Defendants not only deprived COLE-HATCHARD of his rights, but injured him.

156.    COLE-HATCHARD has no adequate remedy at law for the harm and damage

caused by Defendants' violation of liberty and property interests.

157.    Defendants have caused COLE-HATCHARD to suffer, and to continue to suffer,

irreparable harm, damage and injury.

158.    COLE-HATCHARD will continue to so suffer unless the Defendants' conduct as

complained herein is permanently enjoined.

159.    COLE-HATCHARD respectfully requests that the Court grant him relief from

the injuries complained of herein, as more particularly stated in the Prayer for Relief.

## THIRD CLAIM FOR RELIEF:
## VIOLATION OF COLE-HATCHARD'S
## RIGHT TO FREEDOM OF ASSOCIATION

160.    COLE-HATCHARD repeats and realleges paragraphs 1-159 as if fully set forth

herein.

161.    COLE-HATCHARD enjoys, as do all citizens of the United States, the right to

form and maintain associations with others, including for the accomplishment of common goals

and purposes.

162.    Based on his long record, both in law enforcement, in public office, and in the

community generally, the local news reporter sought out COLE-HATCHARD for his informed

28

opinion and insights on research he has completed related to possible violations or skirtings of New York's campaign finance laws.

163.    COLE-HATCHARD's freedom of association includes the right to associate with others for the purpose of identifying, preventing, and eradicating public corruption in the form of campaign finance law violations.

164.    Defendants' actions deprived and continue to deprive COLE-HATCHARD above-referenced of his right to freedom of association as secured by the First Amendment to the United States Constitution and made applicable to the States by the Fourteenth Amendment.

165.    COLE-HATCHARD has no adequate remedy at law for the harm and damage caused by Defendants' violation of his constitutional rights.

166.    Defendants have caused COLE-HATCHARD to suffer, and to continue to suffer, irreparable harm, damage and injury. COLE-HATCHARD will continue to suffer such damages unless Defendants' actions complained of are permanently enjoined.

167.    COLE-HATCHARD respectfully requests that the Court grant him relief from the injuries complained of herein, as more particularly stated in the Prayer for Relief.

## FOURTH CLAIM FOR RELIEF:
## VIOLATION OF COLE-HATCHARD'S
## RIGHT TO EQUAL PROTECTION OF THE LAWS

168.    COLE-HATCHARD repeats and realleges paragraphs 1-167 as if fully set forth herein.

169.    Defendants' actions deprived and continue to deprive COLE-HATCHARD of his right to equal protection of the laws, as secured by the Fourteenth Amendment, by discriminating against and targeting COLE-HATCHARD for disfavor based upon his refusal to

comply with Defendants' political agenda in a manner which constitute a grave interference with said fundamental rights.

170. COLE-HATCHARD has no adequate remedy at law for the harm and damage caused by Defendants' violation of his constitutional rights.

171. Defendants have caused COLE-HATCHARD to suffer, and to continue to suffer, irreparable harm, damage and injury. COLE-HATCHARD will continue to suffer such damages unless Defendants' actions complained of are permanently enjoined.

172. COLE-HATCHARD respectfully requests that the Court grant him relief from the injuries complained of herein, as more particularly stated in the Prayer for Relief.

## PRAYER FOR RELIEF

WHEREFORE, STEPHEN COLE-HATCHARD prays for the following relief against Defendants:

A. That the Court enter a Declaratory judgment that the Defendants' continued efforts to suppress COLE-HATCHARD's exercise of his rights to freedom of speech, of the press, of association, and of equal protection are retaliatory for his speech activities undertaken in his capacity as a private citizen on matters of public importance and violate the Constitution of the United States;

B. That the Court enter an ORDER enjoining the Defendants from retaliating against COLE-HATCHARD for his lawful exercise of constitutional rights of speech, press, and association;

C. That the Court enter an Order granting an award of costs and disbursements, including a reasonable award of attorney fees pursuant to 42 U.S.C. § 1988; and

D.        That the Court enter an Order granting to COLE-HATCHARD an award of

damages, both compensatory and punitive, against the Defendants in an amount to be determined

at trial for the loss of his rights under the First and Fourteenth Amendment to the United States

Constitution.

E.        That the Court enter an Order for Defendants to pay COLE-HATCHARD interest

on his damages, including pre-judgment and post judgment interest, as appropriate, on all

amounts due to Plaintiff as a result of this action.

F.        That the Court grant such other, further and different relief to COLE-

HATCHARD as to this Court deems just, proper and equitable.

## DEMAND FOR JURY

Pursuant to Rule 38 (b) of the Federal Rules of Civil Procedure, Plaintiff hereby demands

a trial by jury in this action on all issues so triable.

Respectfully submitted this 22ᵗʰ day of July, 2016

STEPANOVICH LAW, PLC

John G. Stepanovich (JS8876)
516 Baylor Court
Chesapeake, Virginia 23320
(757)-410-9696

And

Russell M. Yankwitt
Kathy S. Marks
Yankwitt, LLP
140 Grand Street, Suite 501
White Plains, New York 10601
(914) 686-1500
*Attorneys for Plaintiff, Stephen Cole-Hatchard*

31

## VERIFICATION PAGE FOR PLAINTIFF

I, Stephen Cole-Hatchard declare as follows:

1. I am the plaintiff in the present case.

2. I have personal knowledge of myself, my activities, and my intentions, regarding those set out in the foregoing Verified Complaint for Declaratory Judgment, Injunctive Relief and Damages; and if called on to testify I would competently testify as to the matters stated herein.

3. I have personal knowledge of The Town of Clarkstown and the individual Defendants their activities, and their intentions, regarding those set out in the foregoing Verified Complaint for Declaratory Judgment, Injunctive Relief and Damages, and if called on to testify I would competently testify as to the matters stated herein.

4. I verify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. 28 U.S.C. § 1746.

Executed on this __22__ day of July, 2016

Stephen Cole-Hatchard

Exhibit I





CLARKSTOWN POLICE DEPARTMENT
ORGANIZATIONAL CHART
2000

Exhibit J

D45860
N/hu

\_\_\_\_\_AD3d\_\_\_\_\_

Argued - March 30, 2015

REINALDO E. RIVERA, J.P.
THOMAS A. DICKERSON
JEFFREY A. COHEN
BETSY BARROS, JJ.

---

2013-02611

DECISION, ORDER & JUDGMENT

In the Matter of Michael Garvey, petitioner/appellant-respondent, v Michael Sullivan, etc., et al., respondents/respondents-appellants.

(Index No. 2416/12)

---

Feerick Lynch MacCartney, PLLC, South Nyack, N.Y. (Donald J. Feerick, Jr., of counsel), for petitioner/appellant-respondent.

Amy Mele, Town Attorney, West Nyack, N.Y. (Richard A. Glickel of counsel), for respondents/respondents-appellants.

Proceeding pursuant to CPLR article 78 to review a determination of the Town Board of the Town of Clarkstown dated November 20, 2012, which adopted the findings and recommendations of a hearing officer dated November 5, 2012, made after a hearing, that the petitioner is not physically able to perform his regular police duties and that his continuing left knee complaints are not related to a certain line-of-duty incident, terminated the petitioner's benefits pursuant to General Municipal Law § 207-c, and declined to re-credit accumulated leave time he used commencing January 17, 2012, which proceeding was transferred to this Court by order of the Supreme Court, Rockland County (Loehr, J.), dated February 21, 2013, and appeal by the petitioner, by permission, from stated portions of the same order, and cross appeal by Michael Sullivan and the Town of Clarkstown, by permission, from stated portions of the same order.

ORDERED that the order is modified, on the law, by deleting the provision thereof granting that branch of the petition which was to annul so much of the determination as declined to re-credit accumulated leave time the petitioner used from January 17, 2012, to November 20, 2012; as so modified, the order is affirmed insofar as appealed and cross-appealed from; and it is further,

ADJUDGED that the determination is confirmed, the petition is denied, and the proceeding is dismissed on the merits; and it is further,

ORDERED that one bill of costs is awarded to Michael Sullivan and the Town of Clarkstown.

On January 9, 2008, the petitioner, a police sergeant employed by the Town of Clarkstown, injured his left knee in the line of duty. Thereafter, the petitioner was absent from work due to his work-related injury and received benefits pursuant to General Municipal Law § 207-c. In April 2010, the petitioner was examined by John Mazella, an orthopedic surgeon appointed by the Town to examine the petitioner. Mazella concluded that the petitioner had a preexisting "gouty condition" in his left knee that was the proximate cause of his present knee condition, and that the petitioner was fit for full duty.

Based on Mazella's conclusions, the Town's Chief of Police directed the petitioner to report for full duty. After the petitioner protested the order, the Chief of Police directed him to return to work in a "transitional, restricted-duty" capacity. The petitioner's treating orthopedic surgeon submitted a letter disputing Mazella's conclusion that the petitioner was fit to return to full duty and stating that the petitioner was fit for light duty that would accommodate his physical limitations. The petitioner's superiors responded by again directing him to report for restricted duty. The petitioner requested a hearing to challenge the discontinuance of his General Municipal Law § 207-c benefits, as provided for in the collective bargaining agreement (hereinafter CBA) between the Town and the petitioner's union, and he returned to work in a restricted-duty capacity on May 29, 2010.

The Town denied the petitioner's request for a hearing, and his union grieved the denial. When the grievance was denied, the union demanded arbitration. In January 2012, the arbitrator sustained the grievance, concluding that the petitioner had a right to a hearing regarding the termination of his General Municipal Law § 207-c benefits. Upon receipt of the arbitrator's award, on January 17, 2012, the petitioner, who had been continuously working in a restricted-duty capacity during the pendency of the grievance procedure and arbitration, advised his superior officer of his position that he was not required to report for work in any capacity until the conclusion of the hearing. In response, the superior officer advised that the petitioner was required to continue his "light duty" assignment pursuant to General Municipal Law § 207-c and that his failure to report for duty was considered being absent from duty without proper authorization. The petitioner then elected to use his accumulated leave time in lieu of General Municipal Law § 207-c payments to cover his absence from work pending the hearing and to avoid disciplinary action.

In accordance with the CBA, the Town appointed a hearing officer to determine whether the petitioner was physically able to perform his regular duties and whether his continuing disability, if any, was related to the line-of-duty incident on January 9, 2008. After the evidentiary hearing, in findings of fact and recommendations dated November 5, 2012, the hearing officer found that the petitioner was not physically able to perform his regular duties and that this inability was not related to the January 9, 2008, incident. The hearing officer credited Mazella's opinion that the petitioner's preexisting gouty condition was the cause of his knee impairment. On November 20,

2012, the Town Board adopted the hearing officer's findings of fact and recommendations and terminated the petitioner's General Municipal Law § 207-c benefits. In addition, the Town Board determined that the petitioner was not entitled to be re-credited with any of the accumulated leave time he used during his absence from work commencing January 17, 2012.

The petitioner commenced this proceeding pursuant to CPLR article 78 to review the determination. The Supreme Court, inter alia, granted that branch of the petition which was to annul so much of the determination as declined to re-credit the petitioner with accumulated leave time he used from January 17, 2012, to November 20, 2012, directed the Town to re-credit the petitioner with that leave time, and transferred the proceeding to this Court pursuant to CPLR 7804(g).

Initially, the Supreme Court properly transferred the proceeding to this Court pursuant to CPLR 7804(g). The determination was made after a hearing directed by law at which evidence was taken (*see Matter of Park v Kapica,* 8 NY3d 302, 310-311), and the petition raises a question of substantial evidence (*see* CPLR 7803[4]). The Supreme Court also properly disposed of two of the petitioner's objections that could have terminated the proceeding within the meaning of CPLR 7804(g) before transferring the proceeding. However, the court should have disposed of the remaining objections that could have terminated the proceeding (*see* CPLR 7804[g]; *Matter of Vaughn v Orlando,* 79 AD3d 1048, 1049). Nevertheless, since the full record is now before us, in the interest of judicial economy, we will decide, on the merits, the remaining objections that could have terminated the proceeding (*see Matter of Vaughn v Orlando,* 79 AD3d at 1049). Moreover, the Supreme Court erred in granting that branch of the petition which was to annul so much of the determination as declined to re-credit the petitioner with accumulated leave time he used from January 17, 2012, to November 20, 2012, since disposition of the objection to that portion of the determination could not have terminated the entire proceeding within the meaning of CPLR 7804(g) (*see Matter of Lieberman v City of New York,* 52 AD3d 719, 720; *Matter of Bradley Corporate Park v Crotty,* 39 AD3d 632, 633-634). Accordingly, we delete so much of the order as granted that branch of the petition, and we will consider that branch of the petition de novo (*see Matter of M&V 99 Franklin Realty Corp. v Weiss,* 124 AD3d 783, 784).

A disabled officer receiving General Municipal Law § 207-c benefits is entitled to a due process hearing before those benefits may be terminated when the officer submits medical evidence contesting the finding of a municipality's appointed physician that the officer is fit for duty (*see Matter of Park v Kapica,* 8 NY3d at 310). Once such evidence has been submitted, an "order to report for duty may not be enforced, or benefits terminated, pending resolution of an administrative hearing, which itself is subject to review under CPLR article 78" (*Matter of Uniform Firefighters of Cohoes, Local 2562, IAFF, AFL-CIO v City of Cohoes,* 94 NY2d 686, 692). However, where the municipality's physician is of the opinion that the officer is able "to perform specified types of light police duty," payment of the full amount of salary or wages may be discontinued should the officer refuse to perform such light police duty if same "is available and offered to [the officer]" and enables him or her "to continue to be entitled to his [or her] regular salary or wages" (General Municipal Law § 207-c[3]; *see Matter of Theroux v Reilly,* 1 NY3d 232, 239). If an officer who refuses to return to light duty fails to provide medical proof that he or she is unable to do so, the municipality may discontinue disability payments without a hearing (*see Matter of Park v Kapica,* 8 NY3d at 312; *Matter of Davis v County of Westchester,* 42 AD3d 791,

793).

Here, there is no dispute that the petitioner was able to perform a light-duty assignment. In May 2010, he received and followed an order to return to work and perform a restricted duty assignment, for which he received his full salary. On January 17, 2012, he refused an offer to continue performing this light-duty assignment, although he remained able to so. Under the statute, the granting of a General Municipal Law § 207-c hearing did not excuse him from performing his light-duty assignment. The petitioner later received an unequivocal order to return to his light-duty assignment, and he again refused, electing instead to use his accumulated leave time. Since the petitioner refused to return to his light-duty assignment commencing January 17, 2012, the Town was entitled to discontinue his benefits without a hearing. Accordingly, the Town's determination not to re-credit the accumulated leave time he used commencing January 17, 2012, was not arbitrary and capricious and must be confirmed.

Judicial review of an administrative determination made after a hearing required by law at which evidence is taken is limited to whether the determination is supported by substantial evidence (*see* CPLR 7803[4]; *300 Gramatan Ave. Assoc. v State Div. of Human Rights,* 45 NY2d 176, 181). Substantial evidence consists of "such relevant proof as a reasonable mind may accept as adequate to support a conclusion or ultimate fact" (*300 Gramatan Ave. Assoc. v State Div. of Human Rights,* 45 NY2d at 180). Here, the hearing officer's determination that the petitioner's disability was not causally related to the line-of-duty incident on January 9, 2008, is supported by substantial evidence. The hearing officer was free to credit the testimony and reports of Mazella, the Town's expert, over the conflicting opinion of the petitioner's treating orthopedic surgeon (*see Matter of Solano v City of Mount Vernon,* 108 AD3d 676, 677; *Matter of Miserendino v City of Mount Vernon,* 96 AD3d 946, 947).

The petitioner's contentions that the determination was affected by errors of law in the hearing procedure are without merit (*see* CPLR 7803[3]). The parties' remaining contentions regarding preliminary and prospective injunctive relief have been rendered academic in light of our determination.

RIVERA, J.P., DICKERSON, COHEN and BARROS, JJ., concur.

ENTER:

Aprilanne Agostino
Clerk of the Court

Exhibit K


# Follow Up
2 messages

---

**George Hoehmann** <g.hoehmann@clarkstown.org>                    Fri, Mar 4, 2016 at 4:58 PM
To: Michael Sullivan <m.sullivan@clarkstown.org>
Cc: Frank Borelli <f.borelli@clarkstown.org>, Stephanie Hausner <s.hausner@clarkstown.org>, John Noto
<j.noto@clarkstown.org>, Valerie Moldow <v.moldow@clarkstown.org>, Lino Sciarretta
<l.sciarretta@clarkstown.org>, Vincent Toomey <vtoomey@vtlawoffice.com>

Chief,

While I disagree with much of your response to my email to you regarding the manner and means of
communication on personnel matters, and again caution you that written communications on such matters,
particularly those that are or may be in litigation is generally not appropriate, I do appreciate the thoughts
contained in the last paragraph of your response.

While final determinations on most policy matters are within the jurisdiction of the Town Board, we value the
opinions of members of the police administration and you as chief provided they are given in an appropriate
manner.

If, therefore, you have a topic you wish to discuss at any time please bring that to my attention and the Town
Board and I will determine if it is a subject for which we desire your opinion either verbally or in writing.

Thank you for your expected cooperation.

—


**George Hoehmann**
*Supervisor*                                                                      ~!~
10 Maple Ave
New City, NY 10956
Office - 845-639-2050
Fax - 845-634-5456
Email - g.hoehmann@clarkstown.org

 Please consider the environment before printing this email.

---

**Michael Sullivan** <m.sullivan@clarkstown.org>                    Fri, Mar 4, 2016 at 5:22 PM
To: George Hoehmann <g.hoehmann@clarkstown.org>
Cc: Frank Borelli <f.borelli@clarkstown.org>, Stephanie Hausner <s.hausner@clarkstown.org>, John Noto
<j.noto@clarkstown.org>, Valerie Moldow <v.moldow@clarkstown.org>, Lino Sciarretta
<l.sciarretta@clarkstown.org>, Vincent Toomey <vtoomey@vtlawoffice.com>

I appreciate that very much. Thank you.
[Quoted text hidden]

Exhibit L

# Clarkstown chief, supervisor spar over police study

Robert Brum, rbrum@lohud.com    3:38 p.m. EDT April 8, 2016

*Sullivan says firm lacks experience; Hoehmann calls remarks 'defensive'*



CLARKSTOWN - The town's police chief said the firm hired to study his $50 million department lacks experience for the job but the town supervisor called the remarks "defensive" and said they demonstrate why such a review is needed.

Chief Michael Sullivan said Thursday that he was shut out of the vetting process that culminated in the selection of the Bonadio Group, which the Town Board hired Tuesday night to conduct the 90-day study. The Pittsford, New York-based company will be paid up to $98,500,

HIRED: Clarkstown picks consultant to study police costs
(/story/news/local/rockland/clarkstown/2016/04/01/clarkstown-picks-consultant-study-police-dept-costs/82467586/)

Supervisor George Hoehmann pushed for the scrutiny to find ways to cut costs in the Police Department, which ranks as the state's second-highest-paid town force.

*(Photo: File photo/The Journal News)*

"I have reservations," Sullivan said. "The company is highly qualified but they've never done an efficiency study like they are asked to do now, and I'm concerned about Clarkstown being the first one."

But Hoehmann said the Town Board's choice sent a clear message.

"Nobody voted for the chief of police," the supervisor said. "I came in on a mandate to ensure we'd look at everything, and that's what we're doing. That's what the people expect and that's what we're going to do and I expect his full cooperation."

Sullivan said the studies Bonadio did on four other police departments were smaller in scope; Clarkstown's study includes reviews of staffing, workload, overtime, specialized units and other aspects of running the force.

"I'm not saying they are not a good company, I'm just saying they don't have the experience," Sullivan said.

Nonetheless, Sullivan said he would cooperate with the study.

"We are going to do everything in our power to make it a success," he said "We're going to do our duty."



Hoehmann called Sullivan's remarks inconsistent and said the chief had an opportunity to meet with Bonadio on his own.

"If he's this defensive before the process has even started, it is troubling and is all the more indicative of why we need to do this study," Hoehmann said.

The supervisor said the selection process took into account concerns expressed by the chief and the PBA that the department be evaluated as a suburban and not a New York City police force.

Hoehmann said Bonadio was more than qualified to handle the job and had put together a multi-disciplinary team that was bringing in law enforcement consultants including Westchester County Public Safety Commissioner George Longworth and Westchester County police Lt. Jeffrey Weiss.

**George Hoehmann took over as Clarkstown's supervisor in January. (Photo: File photo by Peter Carr/The Journal News)**

The Police Department — with 162 officers and 24 civilian employees — makes up a hefty 34 percent of the town's budget. Average pay, which includes salary and overtime, was $166,719 a year for uniformed officers in 2015, according to the Empire Center for New York State Policy.

Sullivan said he's taken his own measures to reduce costs by cutting 12 positions, including 10 officers and two civilians, and lowered the number of cops out on long-term disability.

Clarkstown's cops patrol about 47 square miles in a town of almost 86,000 people.

*Twitter: @Bee_bob (/story/news/2015/07/31/piermont-man-dives-spur-park-pools-reopening/30932633/)*

Read or Share this story: http://lohud.us/1S1DS2Q

**Now is the time to prepare for some of what Medicare Part B doesn't pay.**

AARP endorses the AARP Medicare Supplement Insurance Plans, insured by UnitedHealthcare Insurance Company. UnitedHealthcare

GO LONG

TELL ME MORE

AARP | Medicare Supplement Plan
UnitedHealthcare
Insurance Company

AARP Medicare Supplement
Insurance Plans

1-866-383-3294 (TTY 711)

Exhibit M



**TOWN OF CLARKSTOWN**
**INTER-OFFICE MEMORANDUM**
**OFFICE OF THE SUPERVISOR**

DATE:   April 7, 2016

TO:     Chief Michael Sullivan, CPD

FROM:   George Hoehmann, Supervisor

RE:     Police Study

Chief:

I am writing to express my concerns about your recent actions and conduct. As I have indicated personally and in prior correspondence, you play a vital role in our Town and the men and women of your Department provide perhaps our most vital services. In furtherance of our mission to provide top quality services in a cost effective manner, the Town Board has commissioned a study of the Police Department. While you initially expressed your support for this project, at Tuesday's Town Board meeting you chose, for the first time, to appear at a public meeting and oppose the study and/or the consultants retained to conduct it. You also falsely represented that you had no input into the process. Moreover, you did so without even giving me or the Town Board the courtesy of advance notice so we could consider your changed position on this subject. Irrespective of your position on the topic, the manner in which you chose to express your new found opposition to this project was rude and disrespectful and frankly I would expect much more from anyone in a position such as yours. It also appears to continue a pattern by you of flip flopping on important issues.

You compounded Tuesday night's conduct by failing to attend our regularly scheduled meeting Wednesday morning and instead sending a subordinate employee. You did so without so much as notifying me that you were unavailable. This again was rude and disrespectful, bordering on insubordinate.

It appears to me that you are consciously trying to create an adversarial relationship with the Town Board. As you are well aware, we serve as the Board of Police Commissioners of this Town and you report to us. While you have the right to respectfully disagree with the Board on a subject, you must learn to do so in a constructive non-disruptive manner that allows all of us to manage the police department. When a decision is made by the Town Board on an important policy matter such as this, you are obligated to carry out the Town Board's instructions irrespective of your personal feelings, just as you would expect any of your subordinate employees to do.

The Town Board and I are proud of our police department and have the utmost respect for the personnel in your department. Your apparent fear of any scrutiny of your department, including the police study, cannot stand in the way of making progress and ensuring that vital public safety services are delivered effectively and efficiently.

My staff and I are committed to working with you to improve our relationship and ensuring that you and your department have all justifiable resources needed to serve the public. Notwithstanding your recent actions and conduct, this study is going forward and your complete cooperation is expected. Any attempt to undermine this important project will not be tolerated.

I would like to schedule a meeting with you very soon to make sure you have a clear understanding of this.

cc: Town Board
      Hon. Frank Borelli, Councilman
      Hon. Stephanie Hausner, Councilwoman
      Hon. John Noto, Councilman
      Hon. Valerie Moldow, Councilwoman
Lino Sciarretta, Town Attorney
Vincent J. Balascio, Director of Finance

Exhibit N


## Recruitment

4 messages

**Michael Sullivan** <m.sullivan@clarkstown.org>                                        Mon, Jul 18, 2016 at 11:26 AM
To: George Hoehmann <g.hoehmann@clarkstown.org>, Frank Borelli <f.borelli@clarkstown.org>, Stephanie Hausner
<s.hausner@clarkstown.org>, John Noto <j.noto@clarkstown.org>, Adrienne Carey <a.carey@clarkstown.org>
Bcc: Anthony Ovchinnikoff <a.ovchinnikoff@clarkstown.org>, Robert Mahon <r.mahon@clarkstown.org>, CI Maloney
<cl.maloney@clarkstown.org>

I am sending this email urgently requesting permission to hire some police officers immediately. As I informed you this
past January, we were expecting 4 retirements, but there are always a few surprises. So far this year we have had 2
additional unexpected retirements bringing us down to 6 open positions. In addition we have 2 serious disciplinary issues
which have effectively removed 2 more officers from staffing. This is in addition to the the usual on going issues that
always occur regarding officer injuries. Even if they are relatively short periods there are always at least 1 or 2 at any
given time. At this time we can say that the Clarkstown Police Department is effectively down about 10 positions.

As I stated in January it takes about a year to fully train any person before they can effectively perform the duties of an
officer, 5 months if they have previously been certified through a New York State Police Academy. If we do not hire now,
we will have to wait until next February which means for anyone attending the academy they would not be available for
patrol until sometime in the fall of 2017. The police test is being given this November which means the list will not be
available in time for the February 2017 academy. This problem is compounded by the fact that we have no idea how
many officers are planning on retiring early 2017. Usually we have a good idea, however everyone is being unusually
quiet about their plans. But I guarantee you that there will be retirements.
The academy starts August 1, 2016. We believe that we have at least several, candidates, possibly more, available on
the list that we feel could be hired immediately.

With the state of the Country right now and the unknown staffing levels for next year I feel it is absolutely critical to public
safety that we begin the process immediately. Please feel free to contact me if you have any questions or would like to
talk about this.
Thank you.

---

**George Hoehmann** <g.hoehmann@clarkstown.org>                                        Mon, Jul 18, 2016 at 7:19 PM
To: Michael Sullivan <m.sullivan@clarkstown.org>
Cc: Frank Borelli <f.borelli@clarkstown.org>, Stephanie Hausner <s.hausner@clarkstown.org>, John Noto
<j.noto@clarkstown.org>, Adrienne Carey <a.carey@clarkstown.org>, Lino Sciarretta <l.sciarretta@clarkstown.org>, Vincent
Toomey <vtoomey@vtlawoffice.com>

Chief,

I am troubled and confused by your email as it directly contradicts what you told me several times this year, as recently as
our weekly meeting last week. While it is true that early this year (January) you had requested the ability to hire three
officers for the pending academy, you further indicated that you wanted to make your case directly to the town board at that
time. After lengthy discussion, it was decided that we would not rush the hiring to simply "just fill spots" from the end of the
list. Accordingly, we held off on hiring. At that time, I recall informing you that I was not prepared to hire three officers until
we completed the police review. Reluctantly, you agreed and the matter was settled.

Later in the spring, during one of our weekly meetings, this issue came up again when I asked about the list. I was
surprised that your position appeared to have changed. Specifically, you told me that it was good that we had waited
because some in the department had actually remarked that it was, "the end of the list," and that waiting for the new list
would likely produce better candidates given the large number of officers that we have hired from the current list. We
discussed this again in passing during one of our meetings when covering the topic of diversity and the measures we were
taking to attract good candidates for any potential new hires and you reiterated the same sentiment.

Recently, I raised the issue again during one of our meetings about the potential of no academy due to the austerity
measures being implemented by the County. You offered to me that we were waiting on the new list anyway. This brings us
to last week when you informed me that, "we are meeting minimums" and while not easy we are making it work. I again
mentioned to you that it appeared there was potentially no new class in the academy and we discussed the list. Next, you
offered that there were really no reachable, "viable" candidates with prior service time and thus we had to wait for

candidates to go through the academy anyway. We spoke briefly about this and you did not make any reference in your written agenda for our meeting that led to any other conclusion about new hires. Again, you reiterated that we were meeting minimums.

I fully understand the issues that are unfortunately befalling the nation. For that reason, I coordinated the ceremony and followed this up by addressing every squad to inform the rank and file, along with the town board, of our concern and support. I am deeply concerned because your comments in the email do not appear to be supported by your earlier statements and actions from as recently as last week. If we are indeed short officers due to discipline and retirements and seek to hire candidates now, no one is available with prior service time to fill these potential spots. Moreover, how is it now that "acceptable" candidates are on the list when since February, the position has been that we would wait for the best possible candidates off of the new list? We have several specialty units. Have you considered modifying these assignments to meet minimums? Further, do you have a projection on potential retirements for 2017 to help in planning to fill spots? Finally, this discussion should be held in light of the conclusion of the police review study. The only manner in which we can immediately improve staffing, if needed, is to evaluate assignments of officers to meet staffing levels. The hiring of new officers will not address current staffing levels. Even if hiring could occur now with officers already in service elsewhere, training would not put these officers on the road in the near term.

The inconsistency in your statements are confusing and troubling. Let's discuss when you are able.

[Quoted text hidden]
 [Quoted text hidden]
  ~!~

--



**George Hoehmann**
*Supervisor*                                                                                    ~!~
10 Maple Ave
New City, NY 10956
Office - 845-639-2050
Fax - 845-634-5456
Email - g.hoehmann@clarkstown.org

 Please consider the environment before printing this email.

---

**Michael Sullivan** <m.sullivan@clarkstown.org>                                    Tue, Jul 19, 2016 at 7:17 PM
To: George Hoehmann <g.hoehmann@clarkstown.org>
Cc: Frank Borelli <f.borelli@clarkstown.org>, Stephanie Hausner <s.hausner@clarkstown.org>, John Noto
<j.noto@clarkstown.org>, Adrienne Carey <a.carey@clarkstown.org>, Lino Sciarretta <l.sciarretta@clarkstown.org>, Vincent
Toomey <vtoomey@vtlawoffice.com>

You are absolutely correct in what you say. My position has changed on this matter as a result of my examination of current trends and conditions here. The current environment, the unexpected retirements, the serious disciplinary matters pending, and the second hand information I am receiving regarding retirements next year have forced me to change my opinion on this matter. With the police academy starting in only two weeks it was necessary to reach out to the Town Board immediately. As far as the list goes you are also correct, however our team does believe that there are several viable candidates that could be hired. Whatever the Bonadio Group recommends I believe that the hiring of a few officers now as an insurance policy will probably not have a serious effect. My apologies for any confusion.
[Quoted text hidden]

---

**Michael Sullivan** <m.sullivan@clarkstown.org>                                    Tue, Jul 19, 2016 at 7:23 PM
To: Robert Mahon <r.mahon@clarkstown.org>, Anthony Ovchinnikoff <a.ovchinnikoff@clarkstown.org>

[Quoted text hidden]

Exhibit O


## Investigation
3 messages

---

**g.hoehmann@clarkstown.org** <g.hoehmann@clarkstown.org>                    Tue, Jul 19, 2016 at 8:47 AM
To: m.sullivan@clarkstown.org
Cc: Vincent Toomey <vtoomey@vtlawoffice.com>, l.sciarretta@clarkstown.org, f.borelli@clarkstown.org,
s.hausner@clarkstown.org, Frank Borelli <fborelli@duceyinsurance.com>, j.noto@clarkstown.org, a.carey@clarkstown.org

Chief
It has now been three weeks since the Town Board directed you to investigate allegations of the disclosure of information
to the media by Sergeant Cole-Hatchard. While the initial interview of the sergeant was conducted promptly, the
completion of this investigation has lagged. It would appear that all that is needed is the review of certain records within
the Department's control so I see no reason for this delay. While this investigation has languished, the Town has received
a FOIL request for information pertaining to the disclosure of information to the media regarding the Picott case. We are
concerned that the delay in the completion of the investigation is compromising the Town's position in litigation relating to
Officer Picott.
Please provide me today with a status report on this investigation including progress to date and preliminary findings
including whether telephone records reveal contact between the reporter and Sergeant Cole-Hatchard in proximity to the
email over the Picott case.
Your immediate compliance is expected.

Sent from my iPhone
--
~!~

---

**Michael Sullivan** <m.sullivan@clarkstown.org>                    Tue, Jul 19, 2016 at 12:05 PM
To: George Hoehmann <g.hoehmann@clarkstown.org>
Cc: Vincent Toomey <vtoomey@vtlawoffice.com>, Lino Sciarretta <l.sciarretta@clarkstown.org>, Frank Borelli
<f.borelli@clarkstown.org>, Stephanie Hausner <s.hausner@clarkstown.org>, Frank Borelli <fborelli@duceyinsurance.com>,
John Noto <j.noto@clarkstown.org>, Adrienne Carey <a.carey@clarkstown.org>

This investigation is not lagging. I am proceeding as expeditiously as possible and consistent with standard modern law
enforcement practices. We did interview Sgt. Cole-Hatchard immediately, as the Town Board directed, which led me to
the discovery of the potential email in question. Based on the examination of that email it is necessary to review
additional emails concerning Sgt. Cole-Hatchard which I have just received. I have also reached out to the County to see
if there are any phone records that I can obtain from them that would help shed the truth on this matter. As a law
enforcement professional for over 33 years I can assure you that these investigations can not always be done as quickly
as many people think. I can tell you that it will be necessary to interview Sgt. Cole-Hatchard a second time regarding this
matter, but at this time I have discovered no evidence of improper conduct regarding Sgt. Cole-Hatchard and the PO
Picott disciplinary investigation. Rest assured, as one of the named defendants in the Picott litigation I am as motivated
as anyone to resolve this matter as quickly and as accurately as possible.
[Quoted text hidden]

---

**Michael Sullivan** <m.sullivan@clarkstown.org>                    Tue, Jul 19, 2016 at 12:07 PM
To: Robert Mahon <r.mahon@clarkstown.org>, Anthony Ovchinnikoff <a.ovchinnikoff@clarkstown.org>

As you can see there is concern from the Supervisor in getting this investigation completed as soon as possible. Lets
meet today and discuss how we can move this along as fast as possible.
[Quoted text hidden]

Exhibit P


## Meeting This Evening
2 messages

---

**George Hoehmann** <g.hoehmann@clarkstown.org>
To: Michael Sullivan <m.sullivan@clarkstown.org>
Cc: Susan Resnick <s.resnick@clarkstown.org>

Tue, Jul 19, 2016 at 11:59 AM

Chief,

I would like to meet with you this evening at 7:30 in my office prior to the board meeting.

Thank you.

--



**George Hoehmann**
*Supervisor*
10 Maple Ave
New City, NY 10956
Office - 845-639-2050
Fax - 845-634-5456
Email - g.hoehmann@clarkstown.org

~!~

 Please consider the environment before printing this email.

---

**Michael Sullivan** <m.sullivan@clarkstown.org>
To: George Hoehmann <g.hoehmann@clarkstown.org>
Cc: Susan Resnick <s.resnick@clarkstown.org>

Tue, Jul 19, 2016 at 12:40 PM

Ok
[Quoted text hidden]